40359. VILLAFRANCO v. THE STATE.
40360. VILLAFRANCO v. THE STATE.
40498. DAVIS v. THE STATE.

HILL, Chief Justice.

Guadalupe Villafranco, his brother Carlos, and Jeffrey Davis were tried by a jury and convicted of rape.[1] They appeal, arguing that in two respects the trial court misconstrued Georgia's rape shield statute, OCGA § 24-2-3 (Code Ann. § 38-202.1), thereby erroneously excluding evidence relevant to their defense. They argue in the alternative that if the trial court correctly construed the statute, it is unconstitutional because it violates their right to confrontation as guaranteed by the sixth amendment to the United States Constitution (Code Ann. § 1-806). Davis v. Alaska, 415 U. S. 308 (94 SC 1105, 39 LE2d 347) (1974).

Norma Jean Carter testified that she met the complaining

---

[1] The guilty verdicts were returned on November 30, 1982. In case no. 40359, after the motion for new trial was filed, the transcript of evidence was filed on February 3, 1983. The motion for new trial was amended and heard on May 13, 1983, and was overruled on June 15, 1983. Following the filing of notice of appeal, the record was docketed in this court and the case was argued on November 15, 1983.

witness, Betty Edwards, age 22, on the afternoon of August 2, 1982, and they decided to go out that evening after Edwards got off work. Shortly before eleven they went out, stopping at two places where they had one beer each before going to the lounge at a Savannah motel. According to Carter, at the lounge the victim began drinking mixed drinks and walking from one table to another. Carter saw an old friend, Roger Moore, a state trooper, and asked him to help her get Edwards home. He agreed. When Carter, Moore and Edwards left the motel, Edwards was tipsy and not in condition to drive. Moore and Carter managed to get her car keys away from her. Meanwhile Edwards began talking to a man in a white car who said he was going to a party. She wanted to go too but Carter insisted on taking her home. As they got into Edwards' car she called Carter a bitch, for which she then apologized, and said that Moore and Carter had fouled her up.[2]

Carter, who was driving, was unused to shifting gears. After she had been driving a short distance, it cut off and she pulled over. By then Carter was upset and crying so she asked Moore to drive. When Carter got out, Edwards moved into the driver's seat but Moore took the keys from her. According to Carter's testimony, Edwards got out of the car and pushed Carter several times. Then Edwards started running into the road but Moore grabbed her by the upper arm and stopped her. At that point, the three defendants and a friend drove up in their car. They were cordial. One of them told Carter, who was crying and very upset, "Don't cry, we'll help take care of you." Edwards got in their car voluntarily. They all drove off, the defendants with Edwards in their car following Moore and Carter. The defendants then turned around; Moore turned too and followed them, flashing the lights. When they kept going, Carter decided to just go get her car; she assumed that Edwards had asked the boys to take her to the party. She and Moore drove to Edwards' home where they left Edwards' car and picked up hers.

Roger Moore testified that he was at the motel lounge and Carter asked him to join her, that they all left together, and that Edwards was in no condition to drive. Carter started driving but the car stalled. When they pulled over Edwards moved over to drive, but he took the keys away from her. The defendants came by and offered

---

[2] The transcript of a hearing outside the presence of the jury shows that Moore would have testified that after getting in the car at the motel, Edwards said "I want to go to the party to get me some nookey." Moore further testified that he took that to mean that she wanted to have sexual intercourse. Carter would have confirmed that Edwards said she "wanted to go get some nookey." This evidence was ruled inadmissible under the rape shield law.

help; he told them he thought he had the situation under control but they stopped anyway. He heard Edwards ask them about taking her to a party. He thought she needed to go home so he asked the defendants to help him get her in her car. While they were talking with Edwards and trying to get her into her car, he went around to the other side of the car to calm down Carter, who was crying and scared. When he came back, Edwards was in the defendants' car. Realizing that he probably could not get her into her own car, he asked them to follow him and take her home; they agreed. They followed for 2 or 3 miles but then they turned around. He turned around too and flashed his bright lights at them. He also memorized the tag number. Carter said they were probably going to the party, so he proceeded to take Carter to get her car. He left Edwards' car at her home with the keys on the floorboard.

Edwards testified that she, Moore and Carter left the motel at about 1 a.m. She was tipsy but not drunk. She was not satisfied with the way Carter was driving her car. When Carter pulled over, they all got out and were discussing who would drive and arguing over it a little bit. The defendants pulled up and offered to help. She got in their car because Carter and Moore thought it would be best if she rode with them. They were to take her home, but they turned around before they got there and drove to Big John's Pond. When they turned around they mentioned going to a party and she said no, that she had to go home because she had to get up to go to work. Then they said they would go to Big John's and have their own party and she said no, she had to go home because she had to go to work. They drove to Big John's, however, where they pushed and pulled her out of the car. They went down an embankment; then, despite her fighting and hollering, they took her pants off, held her arms and legs down, and raped her. At one point whoever was trying to hold her feet down twisted her ankle. She continued to scream real loud until someone put his hand over her mouth and said they had a knife and that if she did not stop screaming they would put it through her throat. She was lying on the ground, not on a blanket or sheet. She was assaulted six times; she was unsure who assaulted her when, except that after the fifth time they appeared to have left when Guadalupe Villafranco came back and raped her again. After they left, she found her drawers and one shoe, dressed and walked home, a distance of some six miles. She retrieved her car and drove to a friend's home. They took her to the hospital. She originally told the police she had been raped by six men but that was because she had been raped six times and was distraught at that interview. She identified each of the defendants as having raped her; she also testified that she was not positive that the fourth person in the car, Glen Page, had not raped her. The state

introduced into evidence the bluejeans, underpants, bra and blouse identified as having been worn by Edwards.

A doctor who examined Edwards when she reached the hospital in the early morning hours of August 3 testified that her right breast and right arm were bruised, that she had twisted her left ankle and it was swollen, and that there was a small tear on the outside of her vagina.

Each of the defendants testified. According to them, the three of them and Glen Page had shared a bottle of rum, which they drank with Coke, earlier that evening. Because they were all minors at the time (Guadalupe Villafranco was 16, Carlos Villafranco and Glen Page were 15, and Jeffrey Davis was 14), they had asked someone to buy it for them. On their way home, they saw a car with its hazard lights on. They stopped and asked if they could help. Moore first said no but then he said yes and asked if they could take Edwards home. They agreed. Edwards kissed Guadalupe Villafranco while standing behind the car. As they drove away, she was sitting in Guadalupe's lap. Later she put her arm around Carlos and kissed him. Jeffrey Davis and Glen Page were in the back seat. Because she said they had missed a turn, they turned around; then she said they had missed a turn again and while they were turning the car around on a dirt road, she said she had to go to the bathroom. Guadalupe told her it was not a good place to stop but she insisted. She told them to drive on down and to stop near a ramp and she got out of the car. She went down off the ramp near the pond; the defendants got out of the car and stood on the ramp. She came back up, started talking to Guadalupe and kissing him, and then she led him down beside the ramp. He yelled out for Jeffrey Davis to go get a sheet. There was a sheet in the car that they had used when working on the car earlier that day. Davis went back to the car, where Glen Page was lying on the back seat, got the sheet, and threw it down to Guadalupe. In about 15 minutes, Guadalupe came up and told Carlos to go down to Edwards, which he did. In about 15 minutes Carlos came up and told Jeffrey Davis to go down, which he did. Each admitted having sex with Edwards. After they were through, they came back to the car. Edwards said she would not ride with them. Guadalupe argued with her, saying he was going to take her home, but she refused to go and they left her there.

The defendants and Glen Page all testified that Page did not have sex with Edwards. Glen Page testified that he did not do so because his sister had been raped. In describing the events of the night, he testified that they stopped to help when they saw the car pulled over. Guadalupe talked to Edwards, trying to get her to get back in the car so Moore could take her home. Finally they agreed that they would take her home. As they rode, Jeffrey Davis told him

that they "were gonna fuck her and dump her." They drove to Big John's Pond. As they approached it on a dirt road, she said she had to "pee"; Guadalupe said, "You don't want to get out and pee here, lady." When he stopped, however, she got out of the car on her own and went to use the bathroom. The other three boys also got out of the car. They were there about an hour. He got out three times and walked up to where they were. He heard some screams, but he could not tell what she said. When asked, "Did you ever see anything? What was going on?", he answered, "Yeah, I saw them screwing." "Who?" "Well, first I saw Peeto [Guadalupe], then Charlie, then Jeff." "Did you see anything else while they were doing that?" "No, sir." "Would you state whether or not she was ever held by anybody?" "Yeah." "By whom, do you know sir?" "No, I don't know." They left her there. On the way home he asked Guadalupe how he would feel if that had been his mother or something and Guadalupe answered that "it wasn't, was it?" The next day Mrs. Villafranco came over and told his family that the other boys had been locked up. He then told his stepfather what had happened.

On cross-examination, Page testified that Edwards did not originally get in their car voluntarily, that Guadalupe and Carlos forced her in. But once she was in the car and they were moving, she sat with her legs over Guadelupe's lap and her arm around him. He testified that they first turned around because she said they missed her turn. He also testified that after she got out of the car to use the bathroom and the defendants had gotten out too, he heard her say, "What are y'all hiding from?" Jeffrey Davis then came back to the car for a blanket. After a little bit, he walked over and saw her lying on the blanket, Guadalupe having sex with her, and the other two on each side of her. When asked, "The moans that you heard — you don't know if it was moans of ecstasy of two people making love, or some outcry, is that right?", he responded, "No, sir." He admitted that at a hearing two weeks earlier, he had said that she was yelling. When asked about the apparent inconsistency he said she was "mumbling and screaming."

During the trial, the defendants called as a witness Mary Turner, who worked with Edwards in August of 1982. She was questioned outside the presence of the jury to determine whether her testimony would be admissible under the rape shield law. She testified that on August 2 Edwards had said that she was not wearing underwear. When asked if she was wearing jeans and a pullover blouse (which is what she wore that night) when she left work, she responded, "No, she never wore nothing but a skirt and blouse or dress, and she'd go around and brag to people about that she didn't wear underwear." The trial court ruled this testimony to be

inadmissible.

1. Georgia's rape shield statute, OCGA § 24-2-3 (Code Ann. § 38-202.1), provides as follows: "(a) In any prosecution for rape, evidence relating to the past sexual behavior of the complaining witness shall not be admissible, either as direct evidence or on cross-examination of the complaining witness or other witnesses, except as provided in this Code section. For the purposes of this Code section, evidence of past sexual behavior includes, but is not limited to, evidence of the complaining witness's marital history, mode of dress, general reputation for promiscuity, nonchastity, or sexual mores contrary to the community standards.

"(b) In any prosecution for rape, evidence relating to the past sexual behavior of the complaining witness may be introduced if the court, following the procedure described in subsection (c) of this Code section, finds that the past sexual behavior directly involved the participation of the accused or finds that the evidence expected to be introduced supports an inference that the accused could have reasonably believed that the complaining witness consented to the conduct complained of in the prosecution.

"(c) The procedure for introducing evidence as described in subsection (b) of this Code section shall be as follows:

"(1) At the time the defense shall seek to introduce evidence which would be covered by subsection (b) of this Code section, the defense shall notify the court of such intent, whereupon the court shall conduct an in camera hearing to examine into the defendant's offer of proof.

"(2) At the conclusion of the hearing, if the court finds that any of the evidence introduced at the hearing is admissible under subsection (b) of this Code section, the court shall by order state what evidence may be introduced by the defense at the trial of the case and in what manner the evidence may be introduced.

"(3) The defense may then introduce evidence pursuant to the order of the court."

The trial court excluded evidence of Edwards' statement that she wanted "to go to the party to get some nookey" (see footnote 2) on the ground that it was not communicated to the defendants and therefore did not fall within either of the exceptions in subsection (b) of the statute. The defendants argue that the evidence was admissible because it is not excluded by subsection (a), that is, it is not "evidence relating to the past sexual behavior of the complaining witness" but rather is evidence of present motive, and thus the question of whether it is covered by either of the exceptions in (b) never arises.

We agree with the defendants that this statement was not

inadmissible as evidence of past sexual behavior but was admissible as evidence of existing motive and state of mind. First, the statement was made very shortly before Edwards encountered the defendants. Equally significant is the fact that there is substantial evidence that during the brief time which elapsed, Edwards' desire to go to a party was continuous. There is evidence that Edwards made the statement that she wanted "some nookey" after encountering a man in the parking lot, apparently a stranger, with whom she wanted to go to a party. She became upset with her companions when they would not let her go with the man. According to Moore, when she encountered the defendants, she asked them to take her to a party. Shortly thereafter she left her companions and got in the defendants' car. While she testified that she did so because Carter and Moore told her to, they deny that. She did not testify that she was forced into the car. Alone among the witnesses, Page testified that she was to some degree forced into the car.

All three defendants testified that once she was in the car, she behaved amorously toward the two defendants in the front seat. She denies that. Considering all the testimony as to Edwards' desire to go to a party, we are constrained to find that the jury might have viewed this conflict in the evidence differently had it heard Carter and Moore testify that a short time before she had made the statement that she wanted to go to a party to get "some nookey." See *Commonwealth v. Joyce*, 415 NE2d 181, 187 (Mass. 1981). Thus the error in excluding this testimony was not harmless, and the case must be reversed.

2. The defendants also complain that the trial court erred in excluding the testimony of Edwards' co-worker that Edwards said that she did not wear underpants.[3] The co-worker's testimony constituted circumstantial evidence to impeach Edwards' testimony, which she volunteered, that she was wearing the underpants introduced into evidence by the state, to corroborate Guadalupe's testimony that she was not wearing underpants, and to explain the forensic scientist's testimony. The rape shield law is not applicable to evidence offered to impeach the prosecution's principal witness as to her mode of dress at the time in question.

In *Johnson v. State*, 146 Ga. App. 277 (246 SE2d 363) (1978), the defendant was convicted of burglary and rape. The prosecutrix

---

[3] Edwards' testimony was impeached by Guadalupe Villafranco, who testified that she did not have underpants on. Also, the forensic scientist who examined her clothing testified that the crotch of the underpants was cleaner than that of the jeans and that there was some blood on the jeans but not on the underpants.

testified on direct examination by the state that the defendant asked her why she was scared and was she a virgin. She testified that she answered "yes." Defense counsel then asked if she was a virgin, and she said "yes." The defense offered two witnesses to prove that the prosecutrix was not a virgin at the time; i.e., to impeach the prosecutrix. The exclusion of this evidence was upheld on appeal under the rape shield law.

In *Parks v. State,* 147 Ga. App. 617 (249 SE2d 672) (1978), evidence of the prosecutrix's bad character was correctly excluded under the rape shield law. However, in a concurring opinion, Judge Banke disagreed with *Johnson v. State,* supra, saying in part (147 Ga. App. at 619-620): "The right of impeachment is inviolable and should never be abridged. All courts should endeavor to obtain the truth, and the impeachment process is one of the best methods devised to insure this result. . . . Truth should be sought for the very foundation of the verdict, and it should be the cement of our entire judicial process. There is no justification for letting the witness affirmatively resort to perjurious testimony in reliance on the defendant's disability to challenge her credibility. . . . When she voluntarily testified as to her lack of past sexual conduct, she waived her protection under the law. The shield provided by this law should not be perverted into a license to use questionable or possibly perjurious testimony free from the risk of adverse confrontation. When we condone conduct that erodes the right of impeachment, regardless of who takes the witness stand, we judicially create a weak link in our established purpose of discovering the truth — the object of all legal investigations."

*Johnson v. State,* supra, was a burglary-rape case and the correct result may have been reached. However, we are constrained to apply Judge Banke's concurring opinion in *Parks* under the facts of this case. Such construction saves the statute from the constitutional attack made here, to wit: that the opposite construction would deprive the defendants of their constitutional right to confront, cross-examine and impeach the witnesses against them. Davis v. Alaska, supra, 415 U. S. at 315-316.

3. The remaining enumerations of error either are without merit or can be avoided upon retrial.

*Judgment reversed. All the Justices concur, except Marshall, P. J., Weltner and Bell, JJ., who dissent.*

DECIDED FEBRUARY 16, 1984 —
REHEARING DENIED MARCH 6, 1984.

*Jones, Bordeaux & Associates, John Wright Jones, Noble L.*

*Boykin, Jr., Calhoun, Hubbard, Riddle & Cox, George M. Hubbard III,* for appellant (case no. 40359).

*Martin S. Jackel,* for appellant (case no. 40360).

*Hudson & Galloway, William A. Dowell,* for appellant (case no. 40498).

*Spencer Lawton, Jr., District Attorney, David T. Lock, Assistant District Attorney,* for appellee.

WELTNER, Justice, dissenting.

I dissent inasmuch as I believe that the evidence was properly excluded under the provisions of OCGA § 24-2-3 (Code Ann. § 38-202.1).

I am authorized to state that Presiding Justice Marshall joins in this dissent.