827 A.2d 243

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
ANDERSON GARRON, DEFENDANT–APPELLANT.

Argued March 4, 2003—Decided July 23, 2003.

148

150

*Edwin J. Jacobs, Jr.,* argued the cause for appellant (*Jacobs & Barbone,* attorneys; *Joseph A. Levin* and *Arthur J. Murray,* on the briefs).

*Paul H. Heinzel,* Deputy Attorney General, argued the cause for respondent (*Peter C. Harvey,* Acting Attorney General of New Jersey, attorney).

*Mark H. Friedman,* Assistant Deputy Public Defender, argued the cause for amicus curiae, Office of the Public Defender (*Yvonne Smith Segars,* Public Defender, attorney).

The opinion of the Court was delivered by

ALBIN, J.

A jury convicted defendant of aggravated sexual assault, rejecting his defense that the victim consented to have sexual relations with him. In a split decision, the Appellate Division affirmed. We must determine whether the trial court properly applied the Rape Shield Statute, *N.J.S.A.* 2C:14–7, in excluding evidence of the victim's past relationship with defendant. Defendant claims that the excluded evidence would have explained the events leading to the sexual encounter and to the victim's consent and, therefore, was critical to a fair trial. The State claims that the victim's prior conduct did not possess sufficient probative value on the ultimate issue before the jury, whether defendant forced the victim to perform a sexual act against her will. In these competing arguments are found the tension between defendant's right to confrontation and the compulsory process of witnesses, and the victim's right to be free from an unnecessary invasion of her privacy. We conclude that the trial court misapplied the Rape Shield Statute in keeping from the jury highly relevant evidence that was necessary for a fair determination of the case and, therefore, reverse and remand for a new trial. We also conclude that at the new trial, the court must charge the jury with any lesser-included offenses that are clearly indicated by the evidence, even in the face of objections by the defense or the State. A jury cannot be denied the opportunity to find guilt on a lesser-included offense as a result of the strategic posturing of the parties.

I.

A Cumberland County grand jury indicted defendant Anderson Garron for first-degree aggravated sexual assault, *N.J.S.A.* 2C:14–2a(4), third-degree aggravated criminal sexual contact, *N.J.S.A.* 2C:14–3a, and second-degree official misconduct, *N.J.S.A.* 2C:30–2a, as a result of an encounter on September 28, 1998, between the victim, J.S., and defendant. The precise nature of that encounter was sharply contested by J.S. and defendant at trial. J.S. asserted that defendant raped her, whereas defendant claimed that the

two engaged in a consensual sexual act. The history of the relationship between J.S. and defendant became the central focus of the pretrial proceedings and the trial itself.

J.S. worked as a secretary in the Cumberland County Prosecutor's Office from 1992 until March 1997, and then became a communications operator at Southern State Prison. During that period, defendant was a City of Bridgeton police officer, and his wife, Stephanie Garron (Mrs. Garron), was a detective at the same prosecutor's office. While employed at the prosecutor's office, J.S. saw defendant several times every month when he visited his wife. J.S. viewed her relationship with both Garrons as "friendly," until the day defendant "came to [her] house and ... raped [her]."

## A. *Rape Shield Hearing*

In support of his consent defense, defendant sought to introduce testimony concerning J.S.'s conduct toward him in the years leading up to what he claims was a voluntary sexual encounter. In accordance with the Rape Shield Statute, the trial court conducted a pretrial hearing to determine the admissibility of evidence concerning the relationship between J.S. and defendant. *N.J.S.A.* 2C:14–7a, –7d. The nature of that relationship was graphically detailed through the testimony of five witnesses: defendant; his wife, Mrs. Garron; and three of J.S.'s former colleagues from the prosecutor's office.

Defendant testified that "every time" he visited his wife at the prosecutor's office J.S. would "flirt" with him. At times, "she would reach up around [his] neck and pull [him] down and give [him a] hug and brush herself against [him]." When they passed in the hallway, she would "bat her eyes" and "just smiling bump into [him]," and then as they engaged in conversation, she would "rub [his] arm or touch [his] chest." J.S. would tell defendant that he "spoiled [his] wife," that he "was too good to [his wife]," and that he "needed somebody like her." Additionally, she remarked that "she would like to have a white man like [him]" and that his wife "didn't deserve all the things she got." On one occasion, J.S. "grabbed [his] rear end" as he "was walking up the steps at the

Prosecutor's Office." J.S. did not say anything, "she just kind of smiled." Much of J.S.'s conduct toward and banter with defendant was in the presence of other prosecutor's office employees, including defendant's wife. On her last day at the prosecutor's office in 1997, J.S. had defendant walk "to the corner of the building so [they] couldn't be seen from the front windows and she gave [him]" a "rather passionate kiss."

In the spring of 1998, defendant learned that a Fairfield Township bench warrant had been issued for J.S.'s arrest for failure to resolve a seatbelt violation summons. He went to J.S.'s house and told her that "she had a warrant out for a hundred bucks, to get it taken care of," and that she could post bail without having to be arrested. Several weeks later, when defendant discovered that the arrest warrant was still active, he returned to J.S.'s house to tell her "to get this thing taken care of." In the middle of July, defendant, while on duty, received a dispatch that J.S. was at the municipal building and "wanted to see [him] . . . to pay for the warrant." Defendant handled the paper work on the warrant and gave J.S. a receipt. Defendant described what happened next:

I stood up to walk her out and she says you know you deserve a big old hug and kiss for this because I didn't put her in jail. And she came over like she always did and put her arm around my shoulders and . . . kissed me again like the day she left work. And then she just kind of went hmmm. And that was it she left.

Approximately two weeks later, defendant was standing on the porch of the prosecutor's office waiting for his wife, when J.S. pulled up in her car. In response to a comment made by J.S., defendant said, "are you ready to have an affair now?" "Now that I don't have to look at your wife anymore, you're damn right," replied J.S. With that, defendant told her to give him a call. J.S. left just as defendant's wife came onto the porch. Defendant told his wife that she "better watch it, [J.S.] is ready to fool around."

Defendant's wife, Mrs. Garron, a detective at the prosecutor's office since 1989, testified about the flirtatious behavior between her husband and J.S. and J.S.'s "outrageous" conduct. Mrs. Garron described J.S. as a "touchy feely person." J.S. would always "grab" and "hug" defendant, and "touch" his face, arm, and

chest. J.S. would have full body contact with defendant with her "breast" and "butt." J.S. was not discreet in the attention she lavished on defendant; her behavior was open and notorious. Over the years, J.S. would make bold comments to Mrs. Garron, seemingly in jest, that nevertheless suggested she had designs on defendant. J.S. told Mrs. Garron that "she was going to take [her] husband" and that "she was available" now that she was "in between husbands." She also remarked, "I'll take that man away from you if he spends just one night with me." J.S. thought nothing of stepping between Mrs. Garron and her husband, even in the presence of other people, and going on a riff: "[Y]ou don't need to talk to her, . . . you've got me. You know if you were with me, . . . you'd throw rocks at her. . . . [W]hat do you want with that scrawny white girl." J.S. would often make suggestive remarks to defendant, such as, "I love a man in uniform, is that your gun or are you happy to see me." And she would constantly "give [defendant] a kiss, grab his arm, hold his hand, [and] literally try to pull him away." For her thirtieth birthday present, in 1996, J.S. announced that she wanted defendant: "They don't make men like [defendant] anymore. Where did you find [him]." Sometime in 1995 or 1996, Mrs. Garron learned, apparently from Barbara Carney, a secretary at the prosecutor's office, that J.S. had touched defendant's buttocks. Mrs. Garron confronted J.S., who did not deny the incident: "She laughed . . . . [a]nd she went into this little routine that she does and she said I'm sorry but . . . I was overwhelmed, you know, and she was fanning herself. It was right there in front of me[,] I had no choice."

On J.S.'s last day of employment at the prosecutor's office in March 1997, J.S., defendant, and Mrs. Garron were on the office porch together, and Mrs. Garron told defendant to kiss (assuming just a peck) J.S. goodbye: "I said the thorn in my side is gone . . . [Y]ou two don't ever have to see each other again." J.S. told Mrs. Garron to go in the building because "I got to kiss your husband goodbye. I'm never going to see him again." Mrs. Garron laughed and did go inside. When J.S. returned to the building, with a dramatic flourish, "she threw herself up against the wall"

and fanned herself with her hand, saying, "that is some man. . . . [T]hat man can kiss. Whenever—whenever you need to get rid of him you just send him my way girlfriend."

Mrs. Garron also recalled an incident after one of J.S.'s visits to the prosecutor's office in the summer of 1998. J.S. had been speaking with defendant and Carney on the porch, and Carney told Mrs. Garron as J.S. drove away, "you know [J.S.] says that she's going to have an affair with your husband now that she doesn't have to ·look at you every day." On another visit in September 1998, approximately three months after the Garrons had separated and two weeks before the alleged rape, J.S. spoke with Mrs. Garron on the porch of the prosecutor's office. J.S. "was down" and advised Mrs. Garron that "she needed to find a way not to work anymore" and "to find me a man."

Wendy Frost, a secretary at the prosecutor's office throughout J.S.'s tenure, gave testimony that corroborated to a large degree the accounts of defendant and his wife. In Frost's view, J.S.'s behavior "went beyond flirtation." Frost estimated that J.S. approached defendant every time he came to visit his wife at the prosecutor's office, which was as often as every other week. During defendant's visits, "[J.S.] would immediately get up from her desk" and "interact" with him, by "touching his shoulder, [and] grabbing his arm." When defendant talked with Mrs. Garron, "[J.S.] would get up and stand extremely close to [defendant]" and "make sure she brushed up against him." On those occasions, "she would grab his arm" and "touch[ ] his upper shoulder." J.S. constantly made inappropriate remarks, such as "if your wife's never around let me know. . . . I can take care of you." Frost recalled the remarks by J.S. that stood out most prominently in her mind. One day, Frost, Mrs. Garron, and defendant were out on the porch of the prosecutor's office smoking when J.S. appeared. With regard to Mrs. Garron's plans to visit her family in Virginia, J.S. commented that "she would have no problems going to see [defendant] while [Mrs. Garron] was away." Frost opined that Mrs. Garron had always taken J.S.'s behavior toward defen-

dant "lightly," but not "as a joke." Though Frost was unable to give specific dates of the many incidents, her memory of them had not dimmed.

Terri Seay, another secretary at the prosecutor's office throughout most of J.S.'s tenure, also testified about J.S.'s "very flirtatious behavior" toward defendant. J.S. brushed her "breast area" against defendant's arm and chest on more than one occasion. It seemed that "every time [defendant] was [in the prosecutor's office] she would be somewhere around him." J.S. would go over to defendant and "put her arm on his arm" or "give him a hug" with her arms around his neck. J.S. said that "she liked a man in uniform." Seay had heard that on J.S.'s last day of work at the prosecutor's office, J.S. commented that she was free to "flirt with [defendant]" since she would no longer be working with Mrs. Garron. Nevertheless, Seay believed that J.S. and Mrs. Garron were "friends." Although the incidents occurred during J.S.'s tenure, Seay was unable to give specific dates between September 1992 and March 1997.

Carney, who worked at the prosecutor's office throughout J.S.'s tenure, claimed that she did not see J.S., defendant, and Mrs. Garron together very often. On those occasions when she did, J.S. just "act[ed] like herself .... always happy and talkative." Carney did not recall ever seeing J.S. touch defendant, or ever discussing defendant with J.S. or Mrs. Garron. At trial, however, Carney testified that J.S. told her that defendant had visited her home in the summer of 1998. Two months before the incident at issue, J.S. had asked Carney whether the Garrons were separated. Carney confirmed that they were.

The trial court determined that defendant had presented clear and convincing evidence to dispel the presumption under *N.J.S.A.* 2C:14–7b against admitting evidence of J.S.'s sexual conduct more than one year before the alleged sexual assault. The trial court, however, ruled that only three of the above-described alleged incidents would be admissible at trial: (1) that J.S. had "grabbed" defendant's buttocks in 1995 or 1996; (2) that she had kissed him

passionately in March 1997, on her last day of work at the prosecutor's office; and (3) that she had kissed him similarly in July 1998, after he helped her to resolve the bench warrant. The court concluded that those incidents were admissible under *N.J.S.A.* 2C:14–7d because they were "relevant to show that J.S. consented to the sexual conduct" at issue by demonstrating "a continuing course of conduct on the part of J.S. to engage in sexual conduct with the defendant." The court decided that the remainder of J.S.'s conduct was merely "flirtatious," rather than "sexual," and was therefore not probative of whether she might have actually consented to perform oral sex on September 28, 1998. The court also concluded that the testimony to be excluded did not specify with sufficient particularity the dates between September 1992 and March 1997, that the alleged "sexual conduct, such as hugging and flirting," occurred.

Frost and Seay therefore did not testify at trial. Defendant and Mrs. Garron were not permitted to testify to the catalogue of flirtatious and sexual behavior of J.S., including J.S.'s seeming obsessive attention to defendant, her habit of brushing her body parts against defendant, her constant petting of his arm, chest and face, her many come-on remarks, such as he "needed somebody like her" and was "too good" to his wife, her affirmative response to defendant's inquiry, "are you ready to have an affair now," and her comments that she wanted defendant for her thirtieth birthday and that she was "available" while she was between husbands.

## B. *Trial*

In many ways, the accounts given by J.S. and defendant of their encounter were strikingly similar. How each viewed those events was strikingly different. According to J.S.'s trial testimony, on September 28, 1998, at approximately 3:30 a.m., she was getting ready for her 4:30 a.m. shift at the prison when she heard a knock at the door that separated her dining and laundry rooms, and served as her home's back door. Defendant was at the door, on duty, and in uniform. He informed J.S. that he had been "riding by and noticed that the light was on inside [her] car," and just

wanted to "mak[e] sure everything was okay." After they inspect-ed the car together, J.S. concluded that her son had probably left the light on, because he often played in the car. Defendant remarked that the car of J.S.'s "boyfriend" was not parked in the driveway, and J.S. replied that she had "kicked him out."

Defendant then followed J.S. back into the laundry room, unin-vited, and asked, "Don't I get a hug for this?" J.S. hugged and thanked defendant. When he attempted to kiss her, J.S. resisted, saying, "Andy, I got to go. . . . I got to get to work," and "I don't want to do this. I know your wife. I know Stephanie. And I cannot do this." Defendant grabbed J.S.'s shoulders, "looked [her] dead in [the] face," and said, "Look, I want to see what I been missing all this time." He then pressed her down to her knees with his hands, exposed his erect penis with his right hand, and removed his duty weapon from its holster and placed it within arm's-reach on a nearby dresser.[1] J.S. stopped protesting and trying to stand up when she noticed that the gun's red laser-sight shone against a wall in the laundry room. She believed that meant the gun was fire-ready, and "just needed one little nudge" to shoot.

After defendant tapped J.S.'s lips with his penis, she put it in her mouth. J.S. gagged and tried to back away, hoping that "if [she] didn't do it right and give him what he wanted he would just stop." He kept one hand on her shoulder, and the other on his penis. When J.S. thought he was about to ejaculate, she attempt-ed to stand up, but defendant told her "to get back down there." She did, and "just kept [her] eye on the gun, making sure it was still in the same spot." When she began to gag again, defendant grabbed the back of her head and ejaculated into her mouth. He then "finished himself off" by masturbating, and said, "This is going to be our secret, right?," and left.

---

[1] On cross-examination, J.S. testified that defendant immediately removed his weapon and placed it on a dresser to his right upon re-entering the laundry room, before he kissed her, grabbed her shoulders, and pressed her to her knees.

J.S. did not immediately report the incident, for fear of retaliation. She rinsed her mouth with rubbing alcohol and then drove to work. She disclosed the incident to two co-workers at the prison approximately eight hours later, and said that she had been afraid "the gun might accidentally go off." One of those co-workers testified about J.S.'s distraught state and that J.S. had informed her that she had been sexually assaulted. J.S. reported the incident to law enforcement authorities the following morning.

J.S. testified that defendant "stopped by" her home "about five or six times" while he was on daytime duty between the spring of 1998 and July 16, 1998. He never stayed more than three minutes, and was "[j]ust making sure everything was okay." On one of those occasions, defendant introduced J.S. to his partner. On another occasion, J.S. invited defendant to speak with her ten-year-old son, who had been "acting up in school.... [She] asked [defendant] to come in the house to act like he was going to take [her son] to jail if he didn't start straightening up." Defendant spoke briefly with her son and left.

As to prior sexual conduct with defendant, J.S. stated that she had never touched defendant anywhere on his body in a sexual way before the kiss of July 16, 1998. She claimed that defendant had initiated that kiss and put his tongue into her mouth, and that she was "shocked." She denied ever touching defendant's buttocks or having any conversation with Mrs. Garron about that alleged incident. She also insisted that the alleged March 1997 "goodbye" kiss outside the prosecutor's office and subsequent conversation with Mrs. Garron never occurred, and that defendant had merely kissed her on the cheek in the office, "like everybody else did," at her going-away party. Finally, J.S. noted that she had filed a tort claim against defendant and the City of Bridgeton as a result of the September 28, 1998 incident, and that she was seeking "punitive damages."

When defendant was arrested, he admitted that he had had oral sex with J.S., but insisted that it was consensual. He adamantly denied "finishing himself off" by masturbating. According to his

trial testimony, J.S. invited him in after they inspected her car together, and said that he "deserve[d] a hug and a kiss for this too." As they kissed, J.S. stroked defendant's groin through his trousers, unzipped his pants, and exposed his penis. She then "slid down in front of [him] and began to perform oral sex." Defendant put his hands on his hips and "leaned backwards." As J.S. unfastened his uniform belt to undress him, defendant's trousers and the attached tools began falling to the floor, so he removed his gun with his right hand and laid it on a nearby surface to his right for safekeeping. Defendant did not recall or believe that the laser-sight of the gun was activated because the pressure-sensitive switch for that function was on the right side of the weapon, and he would have laid the gun down on its left side as he is right-handed. When J.S. finished, they kissed, and she whispered that "it was her turn." Defendant said, "I'll have to owe you one," dressed, and left.

Defendant and J.S. both testified that he called her the next evening to inquire about her work schedule, and said he was "[h]urt" that she did not recognize his voice. She was in her son's room when defendant called and asked him to call her back. He said that he could not call back, but gave J.S. his phone number at the police station so that she could call him back. She never did. The only trial testimony permitted concerning J.S.'s prior conduct was the buttocks-grabbing incident and the passionate kisses of March 1997 and July 1998.

At defendant's urging, and over the State's objection, the trial court refused to charge the jury on sexual assault and criminal sexual contact as lesser-included offenses of aggravated sexual assault and aggravated criminal sexual contact. The court concluded that the only evidence of physical force or coercion causing J.S. to submit to those acts was her fear of defendant's service revolver. The jury was thus charged strictly pursuant to the indictment and returned a guilty verdict on each count.

The trial court sentenced defendant to concurrent terms of eleven years of imprisonment for aggravated assault and three

years of imprisonment for official misconduct, with an 85% No
Early Release Act (NERA) parole disqualifier for each conviction,
*N.J.S.A.* 2C:43–7.2, and to a concurrent term of three years of
imprisonment on the aggravated criminal sexual contact convic-
tion. Defendant's Graves Act parole disqualifiers, *N.J.S.A.* 2C:43–
6c, were subsumed by the NERA disqualifiers. The court also
sentenced defendant to Megan's Law reporting requirements.
*N.J.S.A.* 2C:7–1 to –19.

## II.

In an unreported split decision, the Appellate Division affirmed
defendant's convictions and remanded to the trial court for amend-
ment to the judgment of conviction to reflect defendant's mandato-
ry forfeiture of public office and debarment from future public
employment for official misconduct. The Appellate Division ma-
jority concluded that even though the trial court described the
excluded evidence of J.S.'s prior conduct as "flirtatious, . . . not
sexual," that evidence was properly excluded as non-probative
"sexual conduct" within the meaning of the Shield Statute, because
it was offered to prove consent, and was "not specific enough to be
probative of whether a reasonable person would have believed that
J.S. freely and affirmatively consented to the sexual conduct on
September 28." The majority found that conclusion was sup-
ported by the trial court's finding that J.S.'s conduct was " 'taken
lightly' by the parties," and by the witnesses' inability "to specify
dates, circumstances, or precise times and locations" for the
alleged conduct. The majority reasoned that even if the exclusion
of that evidence was an abuse of discretion, it was harmless
because the jury had been made "well-aware" of J.S. prior "sexual
advances" toward defendant through the admission of evidence
concerning the alleged buttocks grabbing and two passionate
kisses. The majority also held that the trial court's failure to
charge the lesser-included offenses proposed by the State was
invited, not plain error.

Judge Wecker dissented, finding that the proposed testimony concerning J.S.'s prior "flirtatious" conduct was erroneously excluded, because whether or not such evidence fell under the Shield Statute, it was "highly relevant and material to the delicate weighing process on the credibility of defendant and J.S." as to consent, and it "had no potential for invading J.S.'s privacy, or for unduly prejudicing or confusing the jury." Judge Wecker viewed the trial court's ruling as censoring from the jury critical evidence that had a significant potential of altering the outcome of the case.

The jury heard about three incidents of physical contact which the judge deemed relevant, but the jury never heard substantial available evidence from several witnesses of J.S.'s explicit verbal invitations to defendant. And the jury heard only a fraction of the available evidence of J.S.'s expressed desires with respect to him, that coming from Mrs. Garron and not from the two independent witnesses. The excluded remarks were highly relevant and material to the delicate weighing process on the credibility of defendant and J.S. . . . . To artificially distinguish past encounters between defendant and J.S. on the ground that some were "merely flirtatious" reflects a failure to appreciate the legitimate and compelling purpose for which the evidence was offered. Moreover, the precise dates of each comment were unnecessary to establishing threshold reliability, especially after the judge found that the one-year presumption of *N.J.S.A.* 2C:14-7b was overcome with respect to the incidents that were admitted.

Judge Wecker also concluded that the trial court's failure to charge the proposed lesser-included offenses at defendant's request constituted reversible error, because the public interest in fair and proper convictions outweighed defendant's interest in the trial strategy of gambling on an all-or-nothing verdict. She reasoned that the evidence was such that a reasonable juror could have concluded that defendant used only physical force, and never verbally or physically threatened J.S. with his gun.

Defendant's appeal is before us as of right under *Rule* 2:2–1(a)(2), based on the dissent. We now reverse.

### III.

Defendant argues that evidence of J.S.'s six-year course of conduct—her obsessive attention to him during his visits to the prosecutor's office, her repeated physical contact with him, the verbal come-ons and sexual innuendoes, the kissing, and the

banter about having an affair—"was highly relevant and material" to his consent defense and, therefore, admissible under *N.J.S.A.* 2C:14–7. He also posits that exclusion of that evidence deprived him of his federal and state constitutional rights to confrontation, compulsory process, and due process. The State contends that the excluded evidence "was not sufficiently probative" of the consent defense and that the trial court properly exercised its gate-keeping function by filtering out the instances of J.S.'s conduct that were remote and of questionable relevance.

At stake in our evaluation of *N.J.S.A.* 2C:14–7 are competing rights: the right of a person accused of a crime to confront his accuser and to present evidence in support of his defense, and the right of a victim to maintain her privacy from unwarranted intrusions into her past. In balancing these competing claims, we must look to the nature and the quality of the evidence offered and the need for that evidence to assure a fair determination of the issues.

### A.

New Jersey's Rape Shield Statute restricts a defendant's ability to introduce evidence of the victim's prior "sexual conduct." *N.J.S.A.* 2C:14–7. The overarching purpose of the Rape Shield Statute is to protect the privacy interests of the victim while ensuring a fair determination of the issues bearing on the guilt or innocence of the defendant. The Shield Statute is intended to deter the unwarranted and unscrupulous foraging for character-assassination information about the victim. The Statute does not permit introduction of evidence of the victim's past sexual conduct to cast the victim as promiscuous or of low moral character. On the one hand, the Shield Statute is intended to encourage the reporting of sexual abuse by assuring victims that they will not be subject to untoward invasions of privacy through excessive and collateral cross-examination of their prior sexual conduct. That objective also recognizes that jury verdicts should not be based on prejudicial excursions into the non-probative private affairs of a

victim. *State v. Cuni,* 159 *N.J.* 584, 597, 733 *A.*2d 414 (1999); *State v. Budis,* 125 *N.J.* 519, 528–29, 593 *A.*2d 784 (1991). On the other hand, the Statute preserves the core values that are protected by the Federal and State Confrontation and Compulsory Process Clauses—the right of the accused to present all relevant evidence necessary for the defense and the right to a fair trial. The privacy interests of the victim must be measured against preserving the integrity of the fact-finding process, the objective of which is to achieve a just verdict.

The Shield Statute attempts to strike a balance between those competing interests by setting forth the limited circumstances in which evidence of a victim's previous "sexual conduct" is admissible in the prosecution of a sexual assault case. *N.J.S.A.* 2C:14–7a to –7d. The Statute defines sexual conduct as "any conduct or behavior relating to sexual activities of the victim, including but not limited to previous or subsequent experience of sexual penetration or sexual contact. . . ." *N.J.S.A.* 2C:14–7f. As occurred here, first the defendant is required to make application for an *in camera* hearing to determine the admissibility of the evidence. *N.J.S.A.* 2C:14–7a. At the hearing, the trial court must determine whether the evidence falls within one of the few exceptions to the general rule prohibiting the use of the victim's prior sexual conduct. The relevant exception here deals with the defense of consent:

> Evidence of the victim's previous sexual conduct with the defendant shall be considered relevant if it is probative of whether a reasonable person, knowing what the defendant knew at the time of the alleged offense, would have believed that the alleged victim freely and affirmatively permitted the sexual behavior complained of. [*N.J.S.A.* 2C:14–7d.]

However, before such evidence is admitted several further evidentiary hurdles must be cleared. The Shield Statute only permits evidence of prior sexual conduct if that evidence is "highly material" and "the probative value of the evidence offered substantially outweighs its collateral nature or the probability that its admission will create undue prejudice, confusion of the issues, or unwarranted invasion of the privacy of the victim." *N.J.S.A.*

2C:14–7a.[2] Moreover, "[i]n the absence of clear and convincing proof to the contrary," such evidence "occurring more than one year before the date of the offense charged is presumed to be inadmissible." *N.J.S.A.* 2C:14–7b.

The Shield Statute has been expanded by amendment three times since its 1978 enactment for the purpose of strengthening and expanding the privacy rights of victims.[3] The legislative history to the 1994 amendment reveals that the drafters were concerned specifically about protecting the privacy of a sex-crime victim from collateral examination bearing no relevance to the central issues of the case. The 1994 amendment was "intended to strike an appropriate balance between protecting a defendant's constitutional rights, and protecting a rape victim from an assault upon the victim's character." Assembly Judiciary, Law and Public Safety Committee, *Statement to Assembly Bill No. 677* (Jan. 20, 1994), *reprinted in N.J.S.A.* 2C:14–7 (1995). Through that amendment, the Legislature raised the bar to such evidence from requiring that it merely be

> *relevant and that the probative value of the evidence offered is not outweighed* by its collateral nature or by the probability that its admission will create undue prejudice, confusion of the issues, or unwarranted invasion of privacy of the victim, [*N.J.S.A.* 2C:14–7a (1988) (emphasis added),] [4]

and

---

[2] Evidence is relevant if it has "a tendency in reason to prove or disprove any fact of consequence to the determination of the action." *N.J.R.E.* 401. The "probative value" of evidence is its tendency to establish the proposition that it is offered to prove. *State v. Wilson*, 135 *N.J.* 4, 13, 637 A.2d 1237 (1994). The "materiality" of evidence concerns the strength of the relation between the proposition for which it is offered and an issue in the case. *State v. Hutchins*, 241 *N.J.Super.* 353, 359, 575 A.2d 35 (App.Div.1990).

[3] *See L.* 1988, *c.* 69, § 1 (amending former subsection a to include endangering welfare of child prosecutions under *N.J.S.A.* 2C:24–4 among those to which Statute applies); *L.* 1994, *c.* 95, § 1 (amending former subsections a and c, and adding current subsections d and f); *L.* 1995, *c.* 237, § 1 (adding current subsection e to limit admissibility of victim's manner of dress at time of offense).

[4] The pre-amendment Shield Statute's admissibility threshold was slightly higher than our general rules of evidence, which provide that "relevant evidence

material to negating the element of force or coercion,

[*N.J.S.A.* 2C:14–7c (1988),]

to requiring that the evidence be

*relevant and highly material and meet[ ] the requirements of subsection[ ] ... d .... and that the probative value of the evidence offered substantially outweigh[ ]* its collateral nature.

[*N.J.S.A.* 2C:14–7a (1994) (emphasis added).]

This Court has recognized the tension between the demands of the Confrontation Clause and those of the Rape Shield Statute in interpreting the pre–1994 enactment. *See Cuni, supra,* 159 *N.J.* at 596–99, 733 *A.*2d 414 (addressing 1988 version); *Budis,* 125 *N.J.* at 529–33, 593 *A.*2d 784 (same). In analyzing whether the restrictions on the admissibility of evidence under the current Shield Statute are constitutional, we must review the jurisprudence of the Confrontation Clause and Compulsory Process Clause to determine whether those clauses compel the admission of evidence that would otherwise be barred by the Shield Statute.

## B.

■ The Federal and New Jersey Constitutions guarantee criminal defendants "a meaningful opportunity to present a complete defense." *Crane v. Kentucky,* 476 *U.S.* 683, 690, 106 *S.Ct.* 2142, 2146, 90 *L.Ed.*2d 636, 645 (1986) (internal quotation marks omitted); *Budis, supra,* 125 *N.J.* at 531, 593 *A.*2d 784 (same). "That opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on ... credibility ... when such evidence is central to the defendant's claim of innocence." *Crane, supra,* 476 *U.S.* at 690, 106 *S.Ct.* at 2147, 90 *L.Ed.*2d at 645.

A criminal defendant has the right "to be confronted with the witnesses against him" and "to have compulsory process for

------

may be excluded if its probative value is *substantially* outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence," *N.J.R.E.* 403 (emphasis added).

obtaining witnesses in his favor." *U.S. Const.* amend. VI; *N.J. Const.* art. I, ¶ 10. The rights to confront, cross-examine, and produce witnesses have been aptly characterized as "opposite sides of the same coin," because each confers the same fundamental right to elicit testimony favorable to the defense before the trier of fact. David Guy Hanson, Note, *Judicial Discretion in Sexual Assault Cases after State v. Pulizzano: The Wisconsin Supreme Court Giveth, Can the Wisconsin Legislature Taketh Away?*, 1992 *Wis. L.Rev.* 785, 789 (citing Peter Westen, *Confrontation and Compulsory Process: A Unified Theory of Evidence for Criminal Cases*, 91 *Harv. L.Rev.* 567, 601–06 (1978)). *See also* Janet C. Hoeffel, *The Sixth Amendment's Lost Clause: Unearthing Compulsory Process*, 2002 *Wis. L.Rev.* 1275, 1307 (construing rights to confrontation and compulsory process as "sister clauses" which together "make the presentation of a defense at trial complete"). Each has long been recognized as essential to the due process right to a "fair opportunity to defend against the State's accusations," and thus "among the minimum essentials of a fair trial." *Chambers v. Mississippi*, 410 *U.S.* 284, 294, 93 *S.Ct.* 1038, 1045, 35 *L.Ed.*2d 297, 308 (1973).

Those constitutional rights, however, "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process," such as established rules of evidence and procedure designed to ensure the fairness and reliability of criminal trials. *Id.* at 295, 302, 93 *S.Ct.* at 1046, 1049, 35 *L.Ed.*2d at 309, 313; *Budis, supra*, 125 *N.J.* at 531–32, 593 *A.2d* 784. But when the mechanistic application of a state's rules of evidence or procedure would undermine the truth-finding function by excluding relevant evidence necessary to a defendant's ability to defend against the charged offenses, the Confrontation and Compulsory Process Clauses must prevail. *See Chambers, supra*, 410 *U.S.* at 302, 93 *S.Ct.* at 1049, 35 *L.Ed.*2d at 313; *Budis, supra*, 125 *N.J.* at 532, 593 *A.2d* 784. The competing state interest served by barring proposed evidence must be "closely examined" when the denial or significant diminution of the rights of confrontation and

compulsory process "calls into question the ultimate integrity of the fact-finding process." *Chambers, supra,* 410 *U.S.* at 295, 93 *S.Ct.* at 1046, 35 *L.Ed.*2d at 309; *Budis, supra,* 125 *N.J.* at 532, 593 *A.*2d 784. *See also* Cannel, *New Jersey Criminal Code Annotated,* comment 4 on *N.J.S.A.* 2C:14–7d (2003) ("neither statutes nor evidence rules may bar defendant from using evidence and material relevant to his defense where the bar would violate the constitutional right to confront and cross-examine witnesses").

In the seminal case of *Davis v. Alaska,* 415 *U.S.* 308, 94 *S.Ct.* 1105, 39 *L.Ed.*2d 347 (1974), the United States Supreme Court determined that a state's procedural rule and statute protecting the privacy of a juvenile's delinquency record had to give way to the superior claim of the Federal Confrontation Clause. In *Davis,* the State's key witness was serving a probationary term for a delinquency adjudication at the time he cooperated with the prosecution and gave testimony implicating the defendant in a burglary. The defense sought to cross-examine the witness on the basis of bias, arguing that because of the witness's vulnerable status as a probationer, he had reason to curry favor with the State. Relying on the state's provisions protecting the confidentiality of a juvenile adjudication, the trial court barred the defense from eliciting on cross-examination the witness's probationary status. While recognizing the privacy interests at stake, the Supreme Court concluded that "[t]he State's policy interest in protecting the confidentiality of a juvenile offender's record cannot require yielding of so vital a constitutional right as the effective cross-examination for bias of an adverse witness." *Id.* at 320, 94 *S.Ct.* at 1112, 39 *L.Ed.*2d at 356. In reversing the conviction, the Court found that any embarrassment or blemish to the reputation of the juvenile "must fall before the right of [the defendant] to seek out the truth in the process of defending himself." *Ibid.*

In *State v. Budis, supra,* 125 *N.J.* 519, 593 *A.*2d 784, the trial court, relying on the Rape Shield Statute, significantly restricted the defendant's cross-examination of the nine-year-old

victim and a police witness regarding a prior sexual assault on the victim by a person other than the defendant. To explain how a girl of such tender years could describe in detail the sexual acts she attributed to him, the defendant argued that the victim had acquired her source of knowledge of vaginal and oral sex from the prior abuse. *Id.* at 525–27, 593 *A.*2d 784. In concluding that the jurors, as the "sole judges of credibility, were entitled to know that the defendant may not have been the sole source of [the victim's] sexual knowledge," we affirmed the Appellate Division's reversal of the defendant's conviction of aggravated sexual assault. *Id.* at 541, 593 *A.*2d 784 (internal quotation marks omitted). We found that the child-victim's prior molestation was "necessary," "crucial," and "exquisitely important" evidence to the defense. *Id.* at 533, 537, 541, 593 *A.*2d 784. In arriving at that result, we discoursed on the interplay between the Rape Shield Statute and the Confrontation Clause regarding the admissibility of evidence of prior sexual conduct:

First, we must ascertain, apart from the Rape Shield Statute, whether the evidence was relevant to the defense. If the evidence is relevant, we then must decide whether its probative value outweighs its prejudicial effect. *See Crane, supra,* 476 *U.S.* at 689–90, 106 *S.Ct.* at 2146, 90 *L.Ed.*2d at 644–45; *Davis, supra,* 415 *U.S.* at 319, 94 *S.Ct.* at 1111, 39 *L.Ed.*2d at 355. If so, the evidence may not constitutionally be excluded.

[*Id.* at 532, 593 *A.*2d 784. *See also Cuni, supra,* 159 *N.J.* at 600, 733 *A.*2d 414 (same).]

Stated a different way, if evidence is relevant and necessary to a fair determination of the issues, the admission of the evidence is constitutionally compelled. *See, e.g., Olden v. Kentucky,* 488 *U.S.* 227, 229–33, 109 *S.Ct.* 480, 482–84, 102 *L.Ed.*2d 513, 518–20 (1988) (holding that right of confrontation was violated by excluding cross-examination concerning rape victim's cohabitation with defendant's half-brother that was "crucial" to consent defense to demonstrate victim's motive to fabricate); *Rock v. Arkansas,* 483 *U.S.* 44, 52, 62, 107 *S.Ct.* 2704, 2709, 2714, 97 *L.Ed.*2d 37, 46, 52–53 (1987) (holding that right of compulsory process was violated by excluding manslaughter defendant's hypnotically-refreshed testimony concerning circumstances of shooting husband that was

"material and favorable" to defense that gun accidentally discharged); *Crane, supra,* 476 *U.S.* at 690–91, 106 *S.Ct.* at 2146–47, 90 *L.Ed.*2d at 645 (holding that fair trial required admission of testimony that was "central" to defense concerning reliability of sixteen-year-old's confession to murder); *Chambers, supra,* 410 *U.S.* at 294–303, 93 *S.Ct.* at 1045–49, 35 *L.Ed.*2d at 308–13 (holding that rights of confrontation and compulsory process were violated by excluding cross-examination and direct testimony concerning third party's oral and written confessions to murder that was "critical" to defense of third-party guilt); *Washington v. Texas,* 388 *U.S.* 14, 16, 23, 87 *S.Ct.* 1920, 1921–22, 1925, 18 *L.Ed.*2d 1019, 1021, 1025 (1967) (holding that right of compulsory process was violated by excluding co-defendant's testimony concerning circumstances of shooting that was "vital" to defense that co-defendant fired fatal shot).

We must interpret the current version of the Shield Statute in accordance with those constitutional precepts. An unconstrained reading of the Statute leads to the exclusion of prior sexual conduct unless it is *highly* material and its probative value *substantially* outweighs its prejudicial effect. *N.J.S.A.* 2C:14–7a. (The Shield Statute is a complete reversal of *N.J.R.E.* 403, which provides that relevant evidence "may be excluded if its probative value is *substantially* outweighed by the risk of . . . undue prejudice. . . ." *N.J.R.E.* 403(a) (emphasis added)). Accordingly, evidence of prior sexual conduct that is only material (not highly material) and that only has probative value outweighing (not substantially outweighing) its prejudicial impact would not be admissible at trial. That formulation of the Shield Statute would keep from the jury evidence that is admissible under the Confrontation and Compulsory Process Clauses, and the constitutional standard enunciated in *Budis*. We must construe the Statute so that its reach does not exceed its constitutional limits. We reaffirm the test advanced in *Budis* that evidence relevant to the defense that has probative value outweighing its prejudicial effect must be placed before the trier of fact. We do not read the Shield Statute in a way that would deny a defendant a fair trial. In

summary, evidence that is relevant and necessary to prove the defense of consent is not excluded under the Shield Statute.

 Those principles must now be applied to the facts. In doing so, we first must say a word on the mystique of language and manners. Men and women express their feelings and desires in many different ways, from the demonstrative and unequivocal to the subtle and suggestive. Communications in the most mundane matters may have many layers of meaning. Interpreting language and conduct concerning our passions and affairs of the heart may be no easier than deciphering hieroglyphics. Some remarks, if taken literally will mean one thing, and if taken in jest another, and if taken half-in-jest, both one thing and another. Unraveling the riddle of the messages we convey through body language and the spoken word requires a high degree of discernment, for often there are surface and underlying meanings. J.S.'s remarks and physical conduct in reference to defendant are susceptible to varying interpretations. One view is that she engaged in office buffoonery, bawdy humor, and innocent but self-indulgent attention seeking. Another view is that she aggressively pursued defendant, using humor as a thinly-veiled cover for her sexual advances. The jury was particularly well suited to divine the true meaning of the language and conduct of J.S. A jury represents a cross section of the citizens of a community, men and women of varying backgrounds and experience who bring an understanding of the everyday practical realities of life. We can trust the jury to distinguish mere playful words and harmless gestures from expressions of sexual desire and sexual advances. Certainly, the trial court was in no better position than the jury to fathom J.S.'s intentions and to understand whether a reasonable person would have believed that J.S. encouraged and ultimately consented to the sexual acts that occurred. In this case, "[t]he role of the factfinder [was] to decide ... whether ... defendant's belief that the alleged victim had given affirmative permission was reasonable." *State in the Interest of M.T.S.*, 129 *N.J.* 422, 448, 609 *A.*2d 1266 (1992). Defendant's state of mind was directly at issue. How

defendant's prior relationship with J.S. affected his state of mind was critical to the ultimate determination of the jury.

The trial judge permitted only fragmented pieces of evidence to be presented to the jury concerning J.S.'s relationship with defendant. That judicial censorship did more than distort the true picture of events leading to the sexual encounter—it made less likely that the jury would believe any part of the defense of consent. The trial court allowed testimony by defendant concerning J.S.'s two passionate kisses and her grabbing his derrière. However, J.S. denied that those events ever occurred. Therefore, the truth regarding those incidents and the sexual encounter was reduced to a credibility contest between just two people. Without the testimony of independent witnesses from the Cumberland County Prosecutor's Office who were able to give examples of J.S.'s public shows of affection toward defendant, it was less likely the jury would believe that J.S. passionately kissed defendant and grabbed his buttocks, and that in turn made it less likely the jury would find believable defendant's consent defense. Had J.S. contradicted Frost's and Seay's testimony describing J.S.'s physical advances toward defendant, as well as her sexually alluring remarks, the case would not have boiled down to a "he said-she said" dispute. The credibility determination between J.S. and defendant may well have hinged on the presentation of seemingly disinterested witnesses whose testimony had no partisan flavor, testimony that would have buttressed defendant's assertions. Each piece of evidence delicately supported another in the presentation of the consent defense, and the removal of key pieces of evidence presaged the total collapse of that defense. Applying another metaphor, the jury was given a book with missing chapters.

This Court is sensitive to the rights and concerns of those who file sexual assault complaints and to the objectives of the Rape Shield Statute. We do not expect, as a result of this ruling, that a trial court will admit into evidence irrelevant and prejudicial material concerning the reputation of a complaining witness. Vic-

tims need not be fearful of our judicial process and must know that they will be treated with dignity and fairness. We do not pass on the credibility of the accounts given by J.S. and defendant. We express no view whether defendant would have succeeded had he been given the full opportunity to present his defense. But that opportunity to cross-examine effectively J.S. and present witnesses on his behalf in furtherance of a legitimate defense was his constitutional right. It was for the jury to decide whether the testimony offered by defendant at the Rape Shield hearing was worthy of belief.

■ The privacy interests of the victim must be measured against preserving the integrity of the fact-finding process, the objective of which is to achieve a just verdict. We cannot say that J.S. had a reasonable expectation of privacy in her past relationship with defendant, much of which was in public view. Even privileges are not absolute. A client or patient waives the protection of the attorney-client privilege or patient-physician privilege when he charges the attorney or physician with malpractice. *See* *N.J.S.A.* 2A:84A–20(2)(c) (*N.J.R.E.* 504(2)(c)) (excepting from attorney-client privilege "communication[s] relevant to an issue of breach of duty by the lawyer to his client"); *N.J.S.A.* 2A:84A–22.4 (*N.J.R.E.* 506(d)) (excepting from physician-patient privilege communications relevant to "action[s] in which the condition of the patient is an element or factor of the claim or defense of the patient"). Confidences, in those circumstances, lose their protected status if the privileged information is necessary for the defense of the lawyer or doctor. *State v. Bey,* 161 *N.J.* 233, 296, 736 *A.*2d 469 (1999); *Circle Chevrolet Co. v. Giordano, Halleran & Ciesla,* 142 *N.J.* 280, 292, 662 *A.*2d 509 (1995), *overruled on other grounds by Olds v. Donnelly,* 150 *N.J.* 424, 440–43, 696 *A.*2d 633 (1997); *Stigliano v. Connaught Labs., Inc.,* 140 *N.J.* 305, 311–12, 316–18, 658 *A.*2d 715 (1995). J.S. could hardly expect her relationship with defendant to remain a private matter if information concerning that relationship was necessary for defendant to receive a fair trial.

In this case, the information withheld from the jury did not concern the victim's intimate relations with persons other than this defendant. The withheld evidence did not paint the victim as a woman with a sordid past, making her allegations unworthy of belief. The withheld evidence, however, did shed light on the victim's relationship with defendant. However unflattering or embarrassing the details, the evidence was offered for a legitimate objective, to support defendant's consent defense. The story left untold by defendant was of a woman infatuated with him and who pursued him aggressively, even in the presence of her fellow office workers and his wife. The defendant needed to explain why he was at the victim's house in the early morning of September 28, why he followed her into the laundry room of her home, and why he reasonably believed she consented to have sexual relations with him. The untidy details of defendant's relationship with J.S. were essential to understanding his side of the story. Selectively editing those details, as the trial court did here, did not advance the truth-seeking function of the trial.

## C.

The Appellate Division majority held that all the excluded evidence of J.S.'s prior "flirtatious" conduct with defendant was properly characterized as "sexual conduct" within the meaning of the Shield Statute, in light of its explicit sexual nature and the purpose for which it was offered. *N.J.S.A.* 2C:14–7d, –7f. We do not agree with that characterization of the evidence. For example, J.S.'s remark to a fellow employee that "she would have no problem going to see [defendant]" while his wife was away on vacation does not fit within the definition of "sexual conduct," *N.J.S.A.* 2C:14–7f, and, therefore the standard of admissibility would be governed not by the Rape Shield Statute but by the general standard for relevance in our evidentiary rules, *N.J.R.E.* 401, 403. That much of the prior relationship evidence squarely fits within the term "sexual conduct" is not, however, subject to dispute. J.S.'s alleged touching of defendant's chest or brushing

her breasts or buttocks against him while uttering comments to the effect that she was sexually attracted and available to him, "every time" he appeared at the prosecutor's office, might well be construed as "sexual contact" with defendant, as that term is defined in the Code of Criminal Justice. *See N.J.S.A.* 2C:14–1d, – 1e (defining "sexual contact" to include intentional touching of victim or actor's buttock or breast through clothing for purposes of sexual arousal or gratification); *N.J.S.A.* 2C:14–7f (defining sexual conduct under the Rape Shield Statute as including "sexual contact"). We need not parse the record to itemize which remarks and conduct were flirtatious or which were sexual because we conclude that the prior relationship evidence, whatever the characterization, was relevant to and necessary for a fair determination of the issues. The verbal and physical conduct, both sexual and flirtatious, was, for the most part, inextricably intertwined in a course of conduct over a six-year period.

The case before us is limited to its unique facts. We do not suggest that in other contexts personal interactions such as a compliment, a hug, or even an occasional off-color comment or joke, should be viewed as anything other than ordinary socializing. The circumstances of each case will determine whether the conduct has bearing on the issue of consent.

Although we do not find it necessary on this record to distinguish flirtatious speech and conduct from sexual conduct under *N.J.S.A.* 2C:14–7f, the issue has been addressed in other jurisdictions with rape shield statutes. *See State v. Detonancour,* 306 *Mont.* 389, 34 *P.*3d 487, 489, 491 (2001) (excluding evidence of prior "flirtatious" conduct of sexual assault victim who pulled defendant onto her lap at birthday party two days before assault on ground evidence did not constitute "sexual conduct" relevant to consent); *People v. Ivers,* 459 *Mich.* 320, 587 *N.W.*2d 10, 12–15 (1998) (holding that victim's general statement to girlfriend that she was "ready to have sex" prior to party was not "past sexual conduct" governed by rape shield statute, but rather admissible evidence relevant to issue of consent); *Commonwealth v. Killen,*

545 *Pa.* 127, 680 *A.*2d 851, 852–54 (1996) (holding that victim's "flirtatious" and "sexually provocative" statements to medical personnel immediately following alleged rape were not governed by rape shield statute, but rather admissible evidence relevant to victim's credibility); *Villafranco v. State,* 252 *Ga.* 188, 313 *S.E.*2d 469, 473 (1984) (holding that victim's general statement to girlfriend that she wanted to "get some nookey" shortly before accepting ride from alleged assailants was not "past sexual behavior" governed by rape shield statute, but rather admissible evidence of victim's existing motive and state of mind with respect to consent).

We also hold that the excluded evidence of J.S.'s alleged prior sexual conduct with defendant was sufficiently described at the Rape Shield hearing so as to allow a reasonable opportunity for the State to prepare for trial and for the trial court to determine whether the evidence offered was sufficiently probative of consent to meet the requirements of *N.J.S.A.* 2C:14–7a and –7d. *See State v. Rowe,* 316 *N.J.Super.* 425, 434–36, 720 *A.*2d 612 (App.Div.1998), *certif. denied,* 160 *N.J.* 89, 733 *A.*2d 494 (1999). Although none of the witnesses at the Rape Shield hearing could provide specific dates when the alleged conduct occurred, it is clear from their testimony it took place on at least a biweekly basis for the duration of J.S.'s five-year tenure at the prosecutor's office, and thereafter, in the summer months immediately preceding the September 28, 1998 incident. Where, as here, the alleged conduct is described as a continuing course of conduct at regular intervals within a fixed period of time, the State has adequate notice. Indeed, the trial court and Appellate Division implicitly concluded as much with respect to the alleged buttocks-grabbing incident, even though the date of that incident was not more specifically described than sometime in 1995 or 1996.

The trial judge found at the Rape Shield hearing that defendant had presented clear and convincing proof of "a continuing course of conduct on the part of J.S. to engage in sexual conduct with the defendant." However, by excluding the vast majority of that

evidence, the jury had no inkling of that course of conduct and was left to evaluate the conflicting versions of the incident in question within the confines of the contested buttocks-grabbing and two passionate kisses, each of which occurred more than one year apart and appeared to be wholly unrelated to each other and to the incident in question. The excluded evidence of J.S.'s conduct was relevant and necessary for a fair determination of the witnesses' relative credibility and on the ultimate issue of consent. We therefore conclude that the exclusion of that evidence was "clearly capable of producing an unjust result," R. 2:10–2, and reverse and remand for a new trial.

## IV.

At the charge conference, the trial court advised counsel that the jury would be instructed on the lesser-included offenses of sexual assault and sexual contact. Shortly before summations were to begin, in a strategic "crap shoot," defense counsel objected to that procedure. As a consequence, the court agreed not to charge the lesser-included offenses, over the protest of the State. The gamble on an all-or-nothing outcome yielded a result not very satisfying to defendant, who was convicted of aggravated sexual assault and aggravated sexual contact. Defendant now claims that the court committed reversible error by following the very strategy he pressed at trial. Defendant argues that the trial court should have ignored his request because the record clearly indicated a rational basis to charge the jury on the lesser-included offenses. Relying on the doctrine that defendant should not benefit from invited error, *State v. Ramseur*, 106 *N.J.* 123, 281–82, 524 *A.*2d 188 (1987), the State contends that defendant is barred on appeal from taking a position inconsistent from the one he advanced before the trial court. Stated differently, having got what he wished for, defendant should not now be heard to complain.

In light of our decision to reverse, we need not decide in this appeal whether a defendant will be entitled to a new trial when, in

accordance with the defendant's wishes, the trial court fails to charge lesser-included offenses that are clearly indicated in the record. We do conclude, however, that the lesser-included offenses should be charged at defendant's new trial. We take this occasion to remind trial courts that their primary obligation is to see that justice is done, and that a jury is instructed properly on the law and on all clearly indicated lesser-included offenses, even if at odds with the strategic considerations of counsel. We reaffirm that the integrity of the justice system and the fact-finding process is not subordinate to the singular interests of the parties. *State v. Powell,* 84 *N.J.* 305, 319, 419 *A.*2d 406 (1980). The public interest in a correct verdict based on the evidence must trump the partisan strategic maneuvering of both the State and defendant. In that regard, the words of Chief Justice Wilentz in *Powell* are quite fitting:

> Very simply, where the facts on record would justify a conviction of a certain charge, the people of this State are entitled to have that charge rendered to the jury, and no one's strategy, or assumed (even real) advantage can take precedence over that public interest.... The judge is more than a referee between contestants. He is the law's representative, and it is his duty to see that the will of the law is done. The real function of the adversary system is to help him fulfill that duty.
>
> [*Id.* at 319, 419 *A.*2d 406.]

No defendant should be convicted of a greater crime or acquitted merely because the jury was precluded from considering a lesser offense that is clearly indicated in the record. In view of this ruling, parties, generally, should not be "surprised" by a court instructing a jury on such a lesser-included offense. Moreover, we cannot foresee specific circumstances that will make defending against a lesser-included offense more unfair or burdensome than defending only against the greater offense, even in those cases in which the defense is alibi or a general denial, "I did not do it." Of course, counsel is still free to argue that the evidence does not support a rational basis for giving a lesser-included jury charge.[5] Nevertheless, in a case in which instruct-

---

[5] If counsel requests a lesser-included charge, the trial court must give that charge if there is a rational basis in the record to do so. *State v. Choice,* 98 *N.J.*

ing a jury on a lesser-included offense would be so unanticipated by either party as to cause complete surprise, or so inconsistent with the defense as to undermine the fairness of the proceedings, the trial court may depart from this general rule, but must place its reasons for doing so on the record. *State v. Perry*, 124 *N.J.* 128, 158–64, 590 *A.*2d 624 (1991); *State v. Choice*, 98 *N.J.* 295, 300–01, 486 *A.*2d 833 (1985).

On the evidence presented here, defendant would be guilty of first-degree aggravated sexual assault if the jury found he accomplished fellatio with J.S. by threatening her, "by word or gesture," with his gun. *N.J.S.A.* 2C:14–2a(4). However, if the jury found that he accomplished that act through the use of "physical force or coercion" only, and that J.S. did not sustain severe personal injury, defendant could only be found guilty of second-degree sexual assault. *N.J.S.A.* 2C:14–2c(1). Similarly, defendant would be guilty of third-degree aggravated criminal sexual contact if the jury found that he masturbated after the fellatio while threatening J.S. with his gun, *N.J.S.A.* 2C:14–2a(4), –3a, but defendant would only be guilty of fourth-degree criminal sexual contact if the jury found that he masturbated without the threat of his weapon, but while using physical force or coercion against J.S., *N.J.S.A.* 2C:14–2c(1), –3b.

As noted by Judge Wecker, the facts supporting the conviction of aggravated sexual assault, even in the absence of consent, were that defendant laid his gun on the dresser, and J.S. was frightened because she saw a red light on the gun and believed that meant that the gun was ready to be fired. There was no evidence that defendant verbally threatened J.S. with the gun, or did anything

---

295, 298, 486 *A.*2d 833 (1985); *State v. Powell*, 84 *N.J.* 305, 317, 419 *A.*2d 406 (1980). In the absence of such a request, the court need not sift through the record to determine whether any combination of facts would support a lesser charge.

*Choice, supra*, 98 *N.J.* at 299, 486 *A.*2d 833. However, the trial court must give a lesser-included charge, even if not requested by counsel, if it is clearly indicated in the record. *Ibid; Powell, supra*, 84 *N.J.* at 318–19, 419 *A.*2d 406.

with it physically, other than place it on the dresser. The jury was presented with two stark choices, either to find defendant not guilty, or to find him guilty of aggravated sexual assault because he was "armed with a weapon" or "threaten[ed] by word or gesture to use the weapon" to compel J.S. to perform a sexual act. That all-or-nothing alternative did not serve the public interest. There were sufficient facts in the record to support convictions of sexual assault and sexual contact if the jury believed that defendant grabbed J.S., forced her to her knees, placed his penis into her mouth, and held her head as he ejaculated. In addition, the act of sexual penetration itself, without J.S.'s consent, would be sufficient to establish the physical force or coercion required to support a sexual assault conviction. *M.T.S., supra,* 129 *N.J.* at 447–49, 609 *A.*2d 1266.

Accordingly, at the new trial, the jury must be instructed on the lesser-included offenses of sexual assault and sexual contact.

## V.

The judgment of the Appellate Division is reversed. The matter is remanded to the Law Division for a new trial consistent with this opinion.

COLEMAN, J., dissenting.

New Jersey's Rape Shield Law, *N.J.S.A.* 2A:84A–32.1 to –32.3, and *N.J.S.A.* 2C:14–7, was enacted " 'to protect rape victims from excessive cross-examination, thereby encouraging them to report the abuse .... [and to] preserve the integrity of trials .... [b]y ensuring that juries will not base their verdicts on prejudice against the victim....' " *State v. Cuni,* 159 *N.J.* 584, 597, 733 *A.*2d 414 (1999) (quoting *State v. Budis,* 125 *N.J.* 519, 529, 593 *A.*2d 784 (1991) (citations omitted)). The critical issue raised in this aggravated sexual assault case is whether the Rape Shield Law permits a defendant to introduce evidence of alleged flirtatious conduct by an alleged rape victim towards the defendant, most of which occurred more than a year prior to the alleged rape, to prove that

the victim consented to the sexual conduct charged in the indictment. The Court today holds that a defendant can present evidence that the victim flirted with him several weeks, months, or even years before the intimate sexual conduct charged in the indictment occurred. Because I believe the Court's decision today is retrogressive and violative of the Rape Shield Law, I must dissent, not because I condone the victim's alleged flirtations, but because I wish to implement the Legislature's intent of preventing victims from being victimized twice: first by the defendant and second by the judicial system.

I.

A.

The Confrontation Clauses of the Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution guarantee the right of an accused in a criminal case to be confronted with the witnesses against him or her, including the right to a meaningful cross-examination. Limits, however, may be placed on that right "to accommodate other legitimate interests in the criminal trial process." *Chambers v. Mississippi,* 410 *U.S.* 284, 295, 93 *S.Ct.* 1038, 1046, 35 *L.Ed.*2d 297, 308 (1973). Our Rape Shield Law is an illustration of such a compromise, the constitutionality of which has been decided already.

Our Rape Shield Law was first adopted in this State by *L.* 1976, *c.* 71, effective August 26, 1976, and codified at *N.J.S.A.* 2A:84A–32.1 to –32.3. Prior to enactment of that statute, the common law of this State permitted a defendant to introduce evidence of the rape victim's general reputation for chastity to support a defense of consent to rape. *State v. Rubertone,* 89 *N.J.L.* 285, 287, 98 *A.* 253 (E. & A.1916); *O'Blenis v. State,* 47 *N.J.L.* 279, 279–80 (Sup.Ct.1885); *State v. Holmes,* 157 *N.J.Super.* 37, 39, 384 *A.*2d 528 (App.Div.1978); *State v. Steele,* 92 *N.J.Super.* 498, 504, 224 *A.*2d 132 (App.Div.1966). That medieval approach to the trial of a

rape case permitted the jury to infer a character trait of immorality that made the sexual encounter more likely to have been by consent. *State v. Budis, supra,* 125 *N.J.* at 528–29, 593 *A.*2d 784. The purposes of the Rape Shield Law here in New Jersey and across the country have been "to protect rape victims from excessive cross-examination" and to "preserve the integrity of trials." *Id.* at 529, 593 *A.*2d 784. Of the fifty state Rape Shield Laws,[1] New Jersey and Wyoming have the strongest.

Our 1976 Rape Shield Law was essentially reenacted with the passage of the New Jersey Code of Criminal Justice in 1979

---

[1] For a list of current Rape Shield Statutes and case law, see Tracey A. Berry, Comment, *Prior Untruthful Allegations Under Wisconsin's Rape Shield Law: Will Those Words Come Back to Haunt You?,* 2002 *Wis. L.Rev.* 1237, 1247 nn. 57–58 (2002):

*Ala. R. Evid.* 412; *Alaska Stat.* § 12.45.045 (Michie 2000); *Ark.Code Ann.* § 16–42–101 (Michie 1999); *Cal. Evid.Code* §§ 782, 1103 (West Supp.2002); *Colo.Rev.Stat. Ann.* § 18–3–407 (1999); *Conn. Gen.Stat.* § 54–86f (2001), *Conn.Code Evid.* § 4[-]11 (2001); *Del.Code Ann. tit.* 11, §§ 3508–09 (1995 & Supp.2000); *Fla. Stat. ch.* 794.022 (2002); *Ga.Code Ann.* § 24–2–3 (1995); *Haw. R. Evid.* 412; *Idaho Code* § 18–6105 (Michie 1997); 725 *Ill. Comp. Stat.* 5/115–7 (Supp.2002); *Ind.Code* § 35–37–4–4 (1998); *Iowa R. Evid.* 5.412; *Kan. Stat. Ann.* § 21–3525 (1995); *Ky. R. Evid.* 412; *La.Code Evid. Ann. art.* 412 (West 1995); *Me. R. Evid.* 412; *Md.Code Ann. art.* 27, § 461A (2001); *Mass. Gen. Laws ch.* 233, § 21B (2000); *Mich. Comp. Laws* § 750.520j (1991); *Minn. R. Evid.* 412; *Miss. R. Evid.* 412; *Mo.Rev.Stat.* § 491.015 (2001); *Mont.Code Ann.* § 45–5–511 (2001); *Neb.Rev.Stat.* § 28–321 (1995); *Nev.Rev.Stat.* 48.069, 50.090 (2002); *N.H. R. Evid.* 412; *N.J. Stat. Ann.* § 2C:14–7 (West Supp.2002); *N.M. Stat. Ann.* § 30–9–16 (Michie 1994); *N.Y.Crim. Pro. Law* § 60.42, (McKinney 1992); *N.C. Gen.Stat.* § 8C–1, R. 412 (2001); *N.D. R. Evid.* 412; *Ohio Rev.Code Ann.* §§ 2907.02, 2907.05 (Anderson 2002); *Okla. Stat. tit.* 12, § 2412 (Supp.2002); *Or.Rev. Stat.* § 40.210 (2001), *Or. Evid.Code R.* 412; *18 Pa. Cons.Stat.* § 3104 (2000); *R.I. Gen. Laws* § 11–37–13 (2000); *S.C.Code Ann.* § 16–3–659.1 (Law. Co-op 1985 & Supp.2001); *S.D. Codified Laws* § 23A–22–15 (Michie 1998); *Tenn. R. Evid.* 412; *Tex.R. Evid.* 412; *Utah R. Evid.* 412; *Vt. Stat. Ann. tit.* 13, § 3255 (1998); *Va.Code Ann.* § 18.2–67.7 (Michie 1996); *Wash. Rev.Code* § 9A.44.020 (2000); *W. Va.Code Ann.* § 61–8B–11 (Michie 2000); *Wis. Stat.* § 972.11; *Wyo. Stat. Ann.* § 6–2–312 (Michie 2001).

The Maryland statute was changed recently. *Md.Code Ann., Crim.* § 3–319, amended by 2003 *Md. Laws ch.* 89 (S.B.453). Arizona has also adopted a Rape Shield statute, *Ariz.Rev.Stat.* § 13–1421 (West 2003).

(Code) and codified at *N.J.S.A.* 2C:14–7. *L.* 1978, *c.* 95, § 2C:14–7. The Code provides that "[t]he provisions of the [C]ode not inconsistent with those of prior laws shall be construed as a continuation of such laws." *N.J.S.A.* 2C:1–1e. Both statutes provide that when a defendant charged with an aggravated sexual assault, or one of a number of other sexual offenses, wishes to introduce evidence during trial of the victim's previous sexual conduct, prior court approval is necessary. A *New Jersey Rules of Evidence* 104 hearing is required to determine the admissibility of such evidence. *N.J.S.A.* 2A:84A–32.1; *N.J.S.A.* 2C:14–7a. After the trial court first determines whether the evidence is relevant and highly material, it must then engage in a balancing process to determine whether the "probative value of the evidence offered ... outweighs its collateral nature or the probability that its admission will create undue prejudice, confusion of the issues, or unwarranted invasion of the privacy of the victim...." *N.J.S.A.* 2C:14–7a; *see N.J.S.A.* 2A:84A–32.1. When evidence of the victim's prior sexual conduct that is sought to be introduced by a defendant occurred more than one year prior to the date of the sexual offense charged in the indictment, the defendant must establish by clear and convincing evidence that such evidence is relevant and probative, and that the balancing process will result in a finding that the probative value of that evidence clearly and convincingly exceeds the statutory negative factors listed in *N.J.S.A.* 2C:14–7a. *See* Biunno, *Current N.J. Rules of Evidence,* comment 6 on *N.J.R.E.* 101(b)(1) at 102 (2003). Otherwise, a statutorily created presumption of inadmissibility is to be deemed unrebutted. *N.J.S.A.* 2C:14–7b and *N.J.S.A.* 2A:84A–32.2.

Prior to 1994, neither of the two statutory provisions contained a standard for determining whether the victim's prior sexual conduct was relevant or probative. Following the 1992–93 Glen Ridge sexual assault trial in Essex County in which the defense was allowed to introduce graphic evidence of the victim's sexual history, *State v. Scherzer,* 301 *N.J.Super.* 363, 392, 413–14, 694 *A.*2d 196 (App.Div.), *certif. denied,* 151 *N.J.* 466, 700 *A.*2d 878 (1997), the Rape Shield Law was strengthened to protect victims'

privacy. Assembly Judiciary, Law and Public Safety Committee, *Statement to Assembly Bill No. 677–L.* 1994, *c.* 95, at 1 (Jan. 20, 1994) (*Assembly Statement* ). The 1994 amendments were intended to "place[ ] [additional] restrictions on a defendant's ability to introduce evidence of the rape victim's past sexual conduct." *Ibid.* Those amendments to the Code's Rape Shield Law, which became effective August 11, 1994, define when the victim's prior sexual conduct is relevant and probative:

> Evidence of the victim's previous sexual conduct with the defendant shall be considered relevant if it is probative of whether a reasonable person, knowing what the defendant knew at the time of the alleged offense, would have believed that the alleged victim freely and affirmatively permitted the sexual behavior complained of. [*N.J.S.A.* 2C:14–7d.]

The 1994 amendments also modified *N.J.S.A.* 2C:14–7a, which now provides that evidence of a victim's past sexual conduct is inadmissible unless it is "relevant and *highly* material and ... [its] probative value ... *substantially* outweighs its collateral nature or the probability that its admission will create undue prejudice, confusion of the issues, or unwarranted invasion of the privacy of the victim." *N.J.S.A.* 2C:14–7a (emphasis added). Finally, the Code's version of the Rape Shield Law defines the victim's "sexual conduct" to mean "any conduct or behavior relating to sexual activities of the victim, including but not limited to previous or subsequent experience of sexual penetration or sexual contact, use of contraceptives, sexual activities reflected in gynecological records, living arrangement and life style." *N.J.S.A.* 2C:14–7e, subsequently renumbered as f. *L.* 1995, *c.* 237, § 1.

In amending the Code's version of the Rape Shield Law, the Legislature clearly intended to protect victims of sexual assault to the maximum extent permissible under the state and federal constitutions. The legislative history in respect of the 1994 amendments provides:

> It is vitally important to assure rape victims that they will not themselves be put on trial if they press charges against their attackers. This bill is intended to strike an appropriate balance between protecting a defendant's constitutional rights, and protecting a rape victim from an assault upon the victim's character. It is in the public interest to protect the privacy of the victim, as opposed to allowing the

defendant to freely examine the victim's past when the examination serves no material or relevant evidentiary or constitutional purpose.

[*Assembly Statement, supra,* at 1.]

The Legislature intended to assure victims of sexual assault that if they took the courageous step of reporting the crime and confronting their attacker at trial, the State would endeavor to protect them from further humiliation in court. The legislative history reflects the Legislature's judgment that the sexual history of rape victims often "serves no material or relevant evidentiary or constitutional purpose," and that judges should be especially vigilant when a defendant wishes to present such evidence. *Ibid.*

Defendant and many others similarly charged have frequently challenged the application of Rape Shield Laws by arguing that the laws deprive them of their constitutional rights of confrontation, compulsory process, and due process. *See, e.g., State v. G.S.,* 278 *N.J.Super.* 151, 170, 650 *A.*2d 819 (App.Div.1994), *rev'd on other grounds,* 145 *N.J.* 460, 678 *A.*2d 1092 (1996); *State v. Ryan,* 157 *N.J.Super.* 121, 124, 384 *A.*2d 570 (App.Div.1978). In *State v. Budis, supra,* 125 *N.J.* at 530–32, 593 *A.*2d 784, we upheld the constitutionality of New Jersey's Rape Shield Law as it existed prior to the 1994 amendments. We noted that the United States Supreme Court has endeavored to maintain a balance between upholding defendants' "fundamental" rights, such as confrontation and cross-examination, and permitting trial courts to " 'retain wide latitude ... to impose reasonable limits on ... cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.' " *Id.* at 532, 593 *A.*2d 784 (quoting *Delaware v. Van Arsdall,* 475 *U.S.* 673, 679, 106 *S.Ct.* 1431, 1435, 89 *L.Ed.*2d 674, 683 (1986)).

### B.

I would not adopt the amorphous "continuing course of conduct" standard used by the Court today to determine when our Rape Shield Law should preclude a defendant from introducing evidence with respect to a victim's prior sexual conduct. Based on the

legislative history and the 1994 amendments to our Rape Shield Law, and because our original Rape Shield Law is contained within the Rules of Evidence enacted by the Legislature, *N.J.S.A.* 2A:84A–17 to –49, I would instead expand and adopt the balancing process established in *N.J.R.E.* 403, as explicated in *State v. Cofield*, 127 *N.J.* 328, 338, 605 *A.*2d 230 (1992), for determining when the victim's prior sexual conduct is admissible. That Rule and *N.J.S.A.* 2C:14–7a focus on excluding otherwise relevant evidence based on prejudice, confusion and waste of judicial time. The Rape Shield Law also focuses on unwarranted invasion of privacy of the victim. I would, however, slightly modify the *Cofield* four-part test to reflect the language and intent of our Rape Shield Law. I would adopt the following multi-part test:

1. The proffered evidence must constitute prior sexual conduct of the victim;
2. It must be relevant to, and probative of, one of the issues enumerated in *N.J.S.A.* 2C:14–7c or d;
3. It must be reasonably close in time to the offense charged in the indictment;
4. The highly probative value of that evidence must substantially outweigh its collateral nature, the probability of undue prejudice to the victim in the eyes of the jury, confusion of the issues, or an unwarranted invasion of the victim's privacy;
5. When the proffered evidence predates the date of the charged offense by one year or more, the proffered evidence is presumed to be inadmissible;
6. To overcome that presumption, the defendant must produce clear and convincing proof that such evidence is admissible by tipping the balancing process in his or her favor.

Adoption of the foregoing *Rule* 403 analysis would provide a well established and meaningful approach as compared to the amorphous "continuing course of conduct" standard adopted by the majority. Furthermore, the *N.J.R.E.* 403 analysis has been used consistently to conduct Rape Shield Law balancing. *State v. Scherzer, supra,* 301 *N.J.Super.* at 413, 694 *A.*2d 196; *State v. G.S., supra,* 278 *N.J.Super.* at 161, 168–69, 650 *A.*2d 819. The exclusion of evidence after a proper *Rule* 403 analysis "is reversible error only if it is critical to the defense, as where there was no other available evidence to" support defenses raised. *State v. Scherzer, supra,* 301 *N.J.Super.* at 414, 694 *A.*2d 196. The evidence excluded by the trial court in this case was not critical to

the defense. In addition to introducing evidence in respect of the three instances of prior sexual conduct of J.S., defendant presented other evidence through his testimony to support the defense of consent.

## II.

### A.

As noted previously, the defense to the charge of aggravated sexual assault was consent to "sexual penetration," thereby admitting that defendant had sexual relations with the victim. The question becomes whose state of mind or conduct must be examined to determine whether the sexual penetration was indeed by consent. The aggravated sexual assault charge filed against defendant, *N.J.S.A.* 2C:14–2a(4), is part of the Code's "provisions covering rape [that] were formulated by a coalition of feminist groups assisted by the National Organization [for] Women (NOW) National Task Force on Rape." *In re M.T.S.*, 129 *N.J.* 422, 440, 609 *A.*2d 1266 (1992). The stated purpose of the Code's rape provisions was "to remove all features [in the Model Penal Code's approach to rape] found to be contrary to the interests of the rape victims." *Ibid.* Because the Code's definitions in respect of sexual assaults "make[ ] no reference to the victim's state of mind or attitude, or conduct in response to the assault[,]" *id.* at 441, 609 *A.*2d 1266, "do[ ] not refer to force in relation to 'overcoming the will' of the victim, or to the 'physical overpowering' of the victim," [and because the] "constituent elements ... focus exclusively on the forceful or assaultive conduct of the defendant[,]" *id.* at 442, 609 *A.*2d 1266, "the victim ... is [not] required to resist and therefore need not have said or done anything in order for the sexual penetration to be unlawful." *Id.* at 443, 609 *A.*2d 1266. Therefore, "[w]hen a defendant claims that he penetrated with permission, he puts his own state of mind in issue...." *State v. Oliver,* 133 *N.J.* 141, 155, 627 *A.*2d 144 (1993). The focus is not on the victim's state of mind; it is instead on defendant's actions "and on the reasonableness of the defendant's alleged belief that the

victim has given [affirmative] permission," *id.* at 156, 627 *A.*2d 144, "to the specific act of sexual penetration." *M.T.S., supra,* 129 *N.J.* at 447–48, 609 *A.*2d 1266. That affirmative consent standard protects women from acquaintance rape while at the same time "promot[ing] equal responsibility by men and women in all sexual encounters." Kathleen F. Cairney, Note, *Addressing Acquaintance Rape: The New Direction of the Rape Law Reform Movement,* 69 *St. John's L.Rev.* 291, 317 (1995).

This Court's decision in *M.T.S.* substantially influenced the 1994 amendments to our Rape Shield Law. *Assembly Statement, supra,* at 2. Both the Code's provisions with respect to rape and the Rape Shield Law were intended to protect rape victims while defining the permissible restrictions on a defendant's attempts to demonstrate the reasonableness of the defendant's alleged belief that the victim has given affirmative permission to the specific act of sexual penetration charged in the indictment.

### B.

Here, the trial court conducted a hearing pursuant to *N.J.S.A.* 2C:14–7a to determine what if any of J.S.'s "previous sexual conduct" would be admissible. The court appears to have decided the admissibility of prior sexual conduct evidence using a blend of the current standard and the less restrictive, pre–1994 *Budis* test, stating, "[w]hen applying the Rape Shield Statute a court must 'review [. . .] whether the evidence [is] relevant and highly material to the defense and whether its probative value outweighs its prejudicial effect.' *State v. Clowney,* 299 *N.J.Super.* 1, 15, 690 *A.*2d 612 [ (App.Div.), *certif. denied,* 151 *N.J.* 77, 697 *A.*2d 549 (1997) ], citing *State v. Budis,* 125 *N.J.* 519, 532, 593 *A.*2d 784 (1991)." After evaluating defendant's proffered evidence for its probative value, the court found that most of it was not probative within the meaning of *N.J.S.A.* 2C:14–7d, thus making the use of any balancing test largely unnecessary.

The trial court categorized all of defendant's evidence of his and J.S.'s prior relationship as follows:

1) That J.S. has on unspecified occasions asked the defendant to drive her to work when she was employed by the Cumberland County Prosecutor's Office; 2) That J.S., on unspecified occasions while working at the [Prosecutor's Office], flirted with the defendant by touching him, hugging him and brushing up against him; 3) That while J.S. worked at the [Prosecutor's Office] she made statements to the defendant that she was "gonna get that man" and that she "needed a man like that" and that the defendant was "too good" for his wife; 4) That while J.S. worked at the [Prosecutor's Office] she grabbed the defendant's buttocks; 5) That on the last day that J.S. worked for the [Prosecutor's Office] in March of 1997, she forced herself on the defendant and kissed him in a provocative manner; 6) That after J.S. had stopped working for the [Prosecutor's Office], she approached the defendant while he was on the front porch of the Prosecutor's Office and stated that she was ready to have an affair with the defendant now that she no longer had to see the defendant's wife every day; 7) That on an occasion in 1998 when J.S. met with the defendant at the Bridgeton Police Department to take care of a motor vehicle warrant, J.S. forced herself on the defendant and kissed him in a provocative manner; 8) That during the sexual assault at issue in this case, the victim forced herself on the defendant and kissed him in a provocative manner.

I agree with the trial court that most of the proffered evidence is "not probative of whether a reasonable person would have believed that J.S. freely and affirmatively consented to the sexual conduct on September 28, 1998."

Application of the *N.J.R.E.* 403 balancing test leads me to conclude that the trial court properly balanced the appropriate factors and concluded that the excluded evidence has little appreciable probative value that is far outweighed by its potential to mislead and prejudice the jury. Two of defendant's proposed witnesses, Wendy Frost and Terri Seay, were not permitted to testify at all. The trial court and the Appellate Division majority properly concluded that their testimony had nothing to do with whether J.S. consented to the sexual encounter with defendant on September 28, 1998.

Frost testified that whenever J.S. encountered defendant visiting his wife at the Prosecutor's Office, she would run to him, stand close to him and touch his arm or shoulder. Frost also described J.S.'s remarks to defendant, that were made in front of Stephanie Garron: "if your wife's never around let me know[;]" "I can take care of you[;]" "[I] would have no problems going to see [defendant] while Stephanie was away." Seay's testimony was similar: that she saw J.S. brush "her breast area" against defendant, that

J.S. frequently hugged him, touched his arm and started flirtatious conversations with him, and that J.S. expressed "how lucky" Stephanie was and that she could flirt with defendant after she ceased working with his wife. Viewed in the abstract, those alleged remarks may make it seem plausible that J.S. wanted to engage in sexual activity with defendant. However, neither Frost nor Seay could provide approximate dates for when any of that behavior occurred (save the remarks made on J.S.'s last day of work in March 1997). In any event, none of their testimony involved events occurring later than March 1997, and they could date back as far as 1992, when J.S. began working at the Prosecutor's Office. Absent a more specific date, the testimony of Wendy Frost and Terri Seay is not probative of whether J.S. consented to engage in sexual activity with defendant on September 28, 1998. Their testimony refers to events that took place sometime between *eighteen months and six years before* the night in question. The Legislature recognized the scant value of such stale evidence when it provided in the Rape Shield Law that "[i]n the absence of clear and convincing proof to the contrary, evidence of the victim's sexual conduct occurring more than one year before the date of the offense charged is presumed to be inadmissible . . . ." *N.J.S.A.* 2C:14–7b. That presumption was not rebutted.

Much of the additional excluded evidence suffers from the same defect: it is far too attenuated in time to have any significant probative value. Stephanie Garron testified at the Rape Shield hearing that J.S. openly touched and hugged her husband and held his hand when J.S. saw him at the Prosecutor's office, and that "the more people that were around the more of a production it became to grab him and hug him." She described "outrageous" remarks made by J.S. ("what do you want with that scrawny white girl[;]" "is that your gun or are you happy to see me[;]" "I'll take that man away from you if he spends just one night with me"), but Stephanie also stated that these remarks were made "for impact . . . . to get to me." Stephanie was permitted to testify at trial that she had confronted J.S. after hearing that J.S. touched her husband's buttocks, and also described the circumstances sur-

rounding J.S. and defendant's "goodbye kiss" on J.S.'s last day of work. All of those incidents took place in or before March 1997. Stephanie was barred from describing only one incident relating to her husband that occurred later, "probably in [19]98," when another Prosecutor's Office employee told Stephanie that "[J.S.] says that she's going to have an affair with your husband now that she doesn't have to look at you every day." That last alleged incident was inadmissible hearsay, *N.J.R.E.* 801(c); *State v. Long*, 173 *N.J.* 138, 152, 801 *A*.2d 221 (2002). Nor was it evidence of the "victim's previous sexual conduct" within the meaning of the Rape Shield statute. The majority includes in its list of excluded evidence additional remarks J.S. made to Stephanie in September 1998. However, it defies reason to claim that those innocuous statements, made to a friend ("she needed to find a way not to work anymore" and "to find me a man"), show intent to perform fellatio on the friend's husband in the near future.

Defendant also testified at the Rape Shield hearing with respect to J.S.'s prior flirtations toward him both inside and outside her workplace. He testified that whenever he saw J.S. at the Prosecutor's Office, she would "make a big production" of hugging him, and brushing "her chest area and . . . her butt area" against him. Defendant described flirtatious remarks J.S. made to him, such as "she would like to have a white man like me. . . . I spoiled my wife . . . I was too good to my wife . . . I needed somebody like her . . . my wife didn't treat me right." Defendant also testified that in or around July 1998, he happened to see J.S. visiting the Prosecutor's Office and asked her if she was ready to have an affair, and she responded "now that I don't have to look at your wife anymore, you're damn right." Defendant invited J.S. to call him. However, she did not accept his offer to call and there was no further contact between them until the early morning of September 28, 1998. The only time J.S. ever initiated contact with defendant away from the Prosecutor's Office was when she called him to help her dispose of the warrant in July 1998, but that occurred only after he visited her home more than once to offer his assistance. A reasonable person would not infer that because J.S. touched and

spoke to defendant in a flirtatious manner when she happened to see him, she was agreeing to have defendant to come to her home at 3:30 a.m., a year or more later, to engage in fellatio. Only one of the excluded incidents of flirtatious conduct described by defendant at the Rape Shield hearing took place within a year of the alleged assault: their meeting on the porch in or about July 1998, when J.S. purportedly expressed her interest in having an affair with defendant. Even if such a remark could be probative of affirmative consent to sex two months in the future, and I submit that it is not, its exclusion was harmless error. As the Appellate Division majority noted, the jury was aware of three prior incidents when J.S. allegedly kissed or touched defendant in a sexual way. The omission of this one statement, which was not followed by any affair-like behavior between J.S. and defendant before September 28, 1998, was not "clearly capable of producing an unjust result." *R.* 2:10–2.

Defendant was permitted to testify at trial in respect of those three acts of "prior sexual conduct" between himself and J.S. Although they satisfy the "prior sexual conduct" requirement, they were of miniscule or no probative value. J.S.'s grabbing of defendant's buttocks, and their "passionate" kisses occurring in March 1997 and July 1998 do not indicate to a reasonable person that J.S. consented to perform fellatio on defendant on September 28, 1998. Nonetheless, those episodes and other evidence were placed before the jury allegedly to support the consent defense. Because of the substantial quantity of evidence heard by the jury with respect to the defense of consensual penetration, there was no violation of defendant's right of confrontation, cross-examination or compulsory process. Hence, the excluded evidence was merely cumulative and not critical to the defense. *State v. Scherzer, supra,* 301 *N.J.Super.* at 414–16, 694 *A.*2d 196.

### III.

Defendant has seized on the trial court's remark that the three incidents of prior sexual conduct that were admitted "show[ ] a

continuing course of conduct on the part of J.S. to engage in sexual conduct with the defendant," and uses that remark to justify his assertion that all of the excluded evidence of J.S.'s alleged flirtation with defendant should have been admitted to fully demonstrate a "continuing course of conduct." However, Rape Shield cases must be analyzed on a case-by-case basis; and in this case the amount of time that passed between the vast majority of J.S.'s alleged flirtation with defendant and the incident complained of lead me to conclude that the prejudicial effect of the excluded evidence far outweighs its miniscule (if any) probative value. In my view, the majority has ordered the admission of excluded evidence based on the erroneous assumption "that cross-examination [of the prosecutrix on that irrelevant evidence] has some mysterious virtue of its own which imparts merit to facts otherwise worthless." 3A *Wigmore on Evidence,* § 878, at 648 (Chadbourn rev.1970).

"Prejudice," in the context of the Rape Shield Law, includes concerns both for victims of sexual assault and for the integrity of jury trials. *State v. Cuni, supra,* 159 *N.J.* at 597, 733 *A.*2d 414. The Legislature was concerned that placing the sexual history of rape victims before a jury would needlessly humiliate them at trial, thereby subjecting them to further abuse while simultaneously discouraging other victims of sexual abuse from reporting the sexual assault. Under common law, women deemed "unchaste" could have their pasts used against them as evidence that they were likelier to consent to sex no matter what the circumstances, and the modern Rape Shield Law eliminates that false presumption. "General bad character for chastity of the person alleged to have been injured may be given by the defendant, as a fact throwing doubt on her statement that the connection was against her will." *O'Blenis v. State, supra,* 47 *N.J.L.* at 280. In this case, the excluded evidence does not include intimate details of J.S.'s private life and does not tend to portray her as "unchaste." *Ante* at 175, 827 *A.*2d at 259–60. Indeed, the relatively innocuous nature of the excluded evidence indicates its low probative value. However, at defendant's new trial J.S. will nonetheless

be cross-examined regarding every aspect of the behavior that even defendant's wife viewed mostly "in a lighthearted way" as it occurred. J.S.'s feeling of being placed under the microscope will not be lessened by the fact that the subject of the questioning did not involve explicit conduct. Moreover, future victims of acquaintance rape might well be less likely to come forward now that they will be under suspicion themselves if they have ever engaged in a flirtation with their subsequent attacker, no matter how innocent it was, no matter how long ago.

Furthermore, the impact the excluded evidence will have on a jury cannot be ignored.[2] The jury will be bombarded with testimony that J.S. rubbed her body against defendant, showered him with attention, and made provocative remarks, mostly between six years and eighteen months prior to the alleged assault. It will be difficult if not impossible for the State to overcome the inference that this testimony will create in the minds of jurors, that J.S. was "asking for it." Under the Court's holding today, it will be virtually impossible for a woman to prove that she was raped by a man whom she had previously expressed interest in, flirted with, or dated, even if she never engaged in sex with him prior to the assault occurred. Today's decision essentially restricts our Rape Shield Law to sexual assaults between victim and violent stranger, which translates into about fifteen percent of rapes. Cairney, *supra*, 69 *St. John's L.Rev.* at 296. That is a result never intended by the Legislature nor constitutionally mandated.

I agree with the Supreme Court of Montana that although evidence of recent sexual intimacy between a victim and a defendant would be admissible, evidence that a victim pulled a defendant onto her lap two days before an alleged assault was not, because

---

[2] *See* Clifford S. Fishman, *Consent, Credibility, and the Constitution: Evidence Relating to a Sex Offense Complainant's Past Sexual Behavior*, 44 *Cath. U.L.Rev.* 709, 725 (1995) (noting that usual "prejudice" analysis applies only to the parties, not to crime victims).

flirtatious behavior is not, contrary to [the defendant's] opinion, an invitation to engage in sexual relations. An examination into the nuances of the victim's interactions with the defendant days before an alleged rape would effectively put the victim on trial. Not only is this evidence irrelevant to the issue of consent, it is precisely the harm that the rape shield statute is designed to prevent.

[*State v. Detonancour,* [306 *Mont.* 389,] 34 *P.*3d 487, 491 (2001).] .

I also agree with the Montana Supreme Court that such flirtatious conduct does not even constitute sexual conduct under the Rape Shield Law and is not probative of whether a victim consented forty-eight hours later. *Ibid.* In contrast, this Court today allows the defense to scrutinize the victim's flirtatious behavior, not merely days before the incident, but weeks, months, or even years before. Such an archaic approach to rape flies in the face of the Legislature's purposes in enacting the Rape Shield Law.

## IV.

I also disagree with the Court's implied holding that a new trial is required because the court failed to instruct the jury on the lesser-included offenses of sexual assault and criminal sexual contact. Although the majority declines expressly to rule on whether it was reversible error for the trial court to refrain from charging the lesser-included offenses at defendant's request, its endorsement of Chief Justice Wilentz's dictum in *State v. Powell,* 84 *N.J.* 305, 318–19, 419 *A.*2d 406 (1980), leads me to believe that the Court would have reversed had this been the sole issue in the case. I agree that, in the future, lesser-included offenses must be charged despite a defendant's request to the contrary as long as "the facts 'clearly indicate' the appropriateness of that charge" and unless such a charge would result in surprise or severely prejudice the defense. *State v. Choice,* 98 *N.J.* 295, 299, 300, 486 *A.*2d 833 (1985); *State v. Perry,* 124 *N.J.* 128, 162–63, 590 *A.*2d 624 (1991). What I cannot endorse is the notion that a defendant who invites error by making a strategic choice to request an all-or-nothing jury charge can obtain a new trial when his or her gamble backfires. This Court has traditionally given great deference to defendants' trial strategies. *State v. Perry, supra,* 124 *N.J.* at 162, 590 *A.*2d 624 ("Trial courts must carefully refrain from

preempting defense counsel's strategic and tactical decisions and possibly prejudicing defendant's chance of acquittal.") However, deference to defense counsel does not require an appellate court to find plain error based on that strategic choice. *State v. Harper,* 128 *N.J.Super.* 270, 277, 319 *A.*2d 771 (App.Div.) (" 'The defendant cannot beseech and request the trial court to take a course of action, and upon adoption by the court, take his chance on the outcome of the trial, and if unfavorable, then condemn the very procedure he sought and urged, claiming it to be error and prejudicial.' ") (citations omitted), *certif. denied,* 65 *N.J.* 574, 325 *A.*2d 708 (1974). The trial court's omission of the lesser-included offense charge did not "cut mortally into the substantive rights of [defendant]" because it "did not demonstrably impair [his] ability to maintain a defense on the merits." *Ibid.* Rather, it was a tactical decision, made by the defense counsel in light of the defense of affirmative consent to sexual penetration. A charge of sexual assault or criminal sexual contact would have been inconsistent with the consent defense. I would not reverse based on defense counsel's strategic choice.

## V.

I would affirm the judgment of the Appellate Division.

*For reversal and remandment*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI and ALBIN—5.

*For affirmance*—Justice COLEMAN—1.