923 A.2d 300 (2007)
393 N.J. Super. 316
STATE of New Jersey, Plaintiff-Respondent,
v.
Kenneth NERO, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted May 1, 2007.
Decided May 31, 2007.
Yvonne Smith Segars, Public Defender, attorney for appellant (Stephen W. Kirsch, Assistant Deputy Public Defender, of counsel and on the brief).
James F. Avigliano, Passaic County Prosecutor, attorney for respondent (Steven E. Braun, Chief Assistant Prosecutor, of counsel and on the brief).
Appellant filed a pro se supplemental brief.
Before Judges KESTIN, WEISSBARD and GRAVES.
*301 The opinion of the court was delivered by
WEISSBARD, J.A.D.
Defendant Kenneth Nero appeals from his conviction on one count of first-degree robbery, N.J.S.A. 2C:15-1 (count one), and one count of simple assault as a lesser-included offense of second-degree robbery, N.J.S.A. 2C:12-1a (count two). On July 15, 2005, defendant was sentenced to a thirteen-year prison term on count one, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, and a consecutive six-month jail term on count two.
The facts adduced at trial were as follows. On March 8, 2003, after attending a party in Paterson, Rakema Nelson and her friend Travell Zimmerman stopped for a soda at American Fried Chicken, a 24-hour restaurant on Broadway. It was about 3:40 a.m. when they arrived. The restaurant was small and fairly crowded despite the late hour. While Nelson waited in line with her pocketbook open in anticipation of her purchase, Zimmerman struck up a friendly conversation with a man in the restaurant. At that point, Nelson testified to the following version of events:
I was approached by someone. We was just saying that  I don't really remember what he was saying in the beginning. But he was like what's in your bag? He asked me what was in my bag. He had my bag, but I don't  like I just wasn't really paying him no attention. I was like whatever. And then he was like give me your shit. And I'm like what? And he's like I'll take it. And he's motioning and says waist, like do you know what I have right here? And that's when my girlfriend stepped in. And she's like what are you doing? Get off of her. And he's like  he turned to her. He's like I'll take your shit too. You don't know what I got right here and he's holding his waist. And she's like wait a minute. Just go ahead. Like she's pushing him, like just go. And then he pushed her against the table and he went  like he hit her. And we were like trying to get him off. And we both were hitting him, trying to get him off of her. And we  once we were leaving out the store, he was  he bumped into another person, which is why his attention was taken off of us. He got in a fight with the guy who was walking in. So, that's how I ended up being able to call the Police.
Further on, she testified:
I just really didn't pay him any attention and I like proceeded to get to the window. And he had his hand on the bag, like on the strap. And I'm like what are you doing? And he's like do you know what I got right here? I'll take your shit.
Q. When  when he said, do you know what I got right here; what did you take  what  what did you think?
A. Like I just wasn't really thinking anything of it. I was just trying to ignore him, because I didn't really know what he was doing. But he wouldn't let go of my purse.
Q. Were you in fear?
A. Yes.
Q. Were you in fear that perhaps he had a weapon?
A. Yes.
Q. And that was  and why did you think that?
A. Because he was motioning to his waistband, asking me if I knew what he had.
Q. So, at this point, he  did he still have his hand on your purse?
A. Yes.
Q. And what was he doing?

*302 A. He was like tugging on  we were going back and forth. He was tugging and I was tugging.
Q. Now, . . . you indicated you were  you were frightened, correct?
A. Yes.
Q. Why didn't you let go and let him have it?
A. I don't know. I just didn't let go.
Q. What happened then?
A. That's when my girlfriend saw him. And she's like what are you doing? Let go of her.
Q. You heard her say that?
A. Yes.
Q. What happened next?
A. And he turned to her, and he's like what? I'll take your shit too.
Q. What happened then?
A. Then she  I don't remember. Like some words were passed between them. And he ended up pushing her up against the table and she fell over the table, and he hit her. And I'm like get off of her. Like he  when he hit her, then I'm like pulling him, and he turned to me to hit me, but we both were like fighting him.
Zimmerman related the following:
A. When we arrived in the store, she and I were talking. We walked into the store together. A gentleman walked into the store and he made an off comment to me, but I just ignored it. And he walked up to Miss Nelson. And while Miss Nelson was talking [to] this gentleman, I was talking to another guy slightly right behind her. I saw the conversation ahead of me with Miss Nelson and the gentleman getting a little agitated.
Q. Early on, could you hear what was being said?
A. I heard some of the conversation. Yes. The majority of it.
Q. Alright. When  when was the first that you heard what was taking place?
A. Like I heard her say go ahead. Like go ahead. And he's like  then I heard him saying what? I'll take your stuff. I'll rob you. I'll take your stuff. And that's when I was like  I said excuse me to the person I was talking to, and I mentioned to the gentleman, I was like, you know, I tapped him, and I was like just go ahead. I was like leave her alone. And that's when he turned to me and was like what B? I'll take your stuff too. And so, after that, it got physical between him and I. Out of not thinking, I told Miss Nelson just to like, you know, hold my bag, whatever, because he was getting in my face and I felt threatened. He was in my face telling me well, I'll take your stuff too. That's when I like told her to hold my bag. And I was like just go ahead. And he pushed me. I told him to go ahead once again and he pushed me again. That's when I hit him and he started  we started fighting. Miss Nelson jumped into the fight, because he and I were fighting. We were fighting in the store. The three of us were fighting. He somehow  like during the fight, he backed me up against the table and I was pushed back onto a table, and he hit me in my eye twice. While I was trying to get up, Miss Nelson was like trying to get out the store, trying to get to her car, and call Police. And he was chasing after her.
. . . .
Q. Did you see that individual with his hands on Miss Nelson's purse or any other part of her?
A. Yes, I did. I saw him grabbing her bag. She had it on her shoulder and I saw him like grabbing at it like in a motion to try to pull it off of her arm.
. . . .

*303 Q. After he said, I'll take  I'll take your stuff too, did he attempt to or get his hands on  on your belongings?
A. I don't really recollect him trying to grab my stuff, because I was telling like Miss Nelson to hold my bag. Like in the hustle of it all, I don't remember him actually trying to grab my possessions. No.
She testified that the conversation between defendant and Nelson "started off as friendly." She did not see defendant gesture to his pants and say "see what I got here or anything like that."
On appeal, through counsel, defendant presents a single argument:
THE JURY INSTRUCTION ON ARMED ROBBERY OMITTED THE MENTAL STATE OF "KNOWINGLY" WITH RESPECT TO THE SIMULATION OF A WEAPON BY WORDS AND GESTURES  A CRITICAL ERROR WHERE THE JURY COULD HAVE DOUBTED WHETHER DEFENDANT KNOWINGLY OR PURPOSEFULLY SIMULATED THE POSSESSION OF A WEAPON. (Not Raised Below)
In a supplemental pro se brief, defendant argues as follows:

POINT ONE: THE TRIAL COURT FAILED TO EXPLAIN THE ELEMENTS OF "KNOWINGLY" WITH REGARD TO THE SIMULATION OF A WEAPON, AND THE CULPABILITY THAT IS REQUIRED BY LAW TO INFLICT BODILY INJURY OR USES OF FORCE AS AN ELEMENT OF FIRST DEGREE ARMED ROBBERY.

POINT TWO: THE TRIAL COURT FAILURE TO MOLD FIRST DEGREE ARMED ROBBERY IN TO THE LESSER INCLUDED OFFENSE OF ATTEMPTED ROBBERY DENIED DEFENDANT A FAIR TRIAL AND WAS CLEARLY CAPABLE OF PRODUCING AN UNJUST RESULT IN THIS CASE. U.S. CONST AMEND. VI, XIV; N.J. CONST (1947) ART I. 1, 9, 10.
Because no weapon was found in defendant's possession, the armed robbery charge was premised on his having simulated the possession of a deadly weapon. See State v. Harris, 357 N.J.Super. 532, 545, 816 A.2d 171 (App.Div.2003). In that regard, the judge instructed the jury as follows:
The count one charge is first degree robbery. There is an additional element. And it's this. In this case, the State alleges further that the defendant did not actually possess a deadly weapon, but instead threatened the immediate use of such weapon, and engaged in conduct or gestures which simulated possession of a deadly weapon, and which would lead a reasonable person to believe that the defendant possessed such a weapon. Consequently, I must first explain, to you . . . what deadly means in the law.
A deadly weapon is any firearm or other weapon, device, instrument, material or substance, which in the manner it is used or is intended to be used, is known to be capable of producing death or serious bodily injury, or which in the manner it is fashioned would lead the victim reasonably to believe it to be capable of producing death or serious bodily injury.
[To] simulate means to assume the outward qualities or appearance of, often with the intent to deceive. It is a feigned pretended act usually to mislead or deceive.
The State does not have to prove that the defendant actually possessed a real deadly weapon, rather the State *304 must prove beyond a reasonable doubt that the defendant led Rakema Nelson to reasonably believe, by words and conduct or gestures, that the defendant possessed such a deadly weapon. It is not sufficient that the defendant only made a threat or a reference to a weapon alone. In other words, the State must prove beyond a reasonable doubt that the defendant not only threatened the. . . immediate use of a deadly weapon, but it must also prove beyond a reasonable doubt that the defendant engaged in conduct or gestures which would lead a reasonable person to believe that the defendant did possess an object, which would constitute a deadly weapon, as I just described it to you.
In this case, the State alleges that the defendant told Rakema Nelson "give me your shit, while holding his hand in his waist, and stating do you know what I got here?" You must determine whether the State has proven beyond a reasonable doubt that the combination of words and conduct, or words and gestures created a reasonable belief in the victim to believe the defendant possessed a deadly weapon capable of causing death or serious bodily injury.
Defendant's contention is that the judge failed to assign a mental state of knowingly to the simulation of possession of a weapon. He argues that such a charge was critical in this case because the jury could have rationally entertained a reasonable doubt as to his intent. Defendant's intent, the argument continues, turned on whether his gesture to his pants was meant to convey possession of a weapon or was, in the circumstances, no more than a crude sexual reference. Here, the judge defined "knowingly" in connection with that aspect of robbery requiring infliction of bodily injury or the use or threatened use of force. However, in an entirely separate part of the instructions concerning simulation, quoted above, the judge did not charge any mental state. We agree with defendant that this was error.
In State v. Sewell, 127 N.J. 133, 134, 603 A.2d 21 (1992), the Court addressed "the level of culpability necessary to convert theft into robbery." Specifically, the Court had "to determine the culpability that a defendant must have when he inflicts injury or uses force against another in the course of a theft in order to escalate theft into robbery." Id. at 138, 603 A.2d 21. In the absence of legislative intent to the contrary, where no mental state is ascribed to a crime or its material elements, the "gap-filler" provision of the penal code comes into play. N.J.S.A. 2C:2-2c(3). That provision provides for a mental state of knowingly where none is stated. Sewell, supra, 127 N.J. at 138-150, 603 A.2d 21. As a result, the Court ascribed the mental state of knowingly to the injury/force element of robbery.
Defendant argues that just as Sewell ascribes the mental state of knowingly to the force/injury element of second-degree robbery, that same mental state should be required for the weapon possession/simulation of a weapon that raises second-degree robbery to first-degree. That conclusion is not, however, inescapable. Indeed, the Model Charge, which the judge followed here, contains no mental state for the elevating armed/simulation element. Model Charges can, of course, be wrong or, as in Sewell itself, incomplete.
In State v. Thomas, 187 N.J. 119, 137-38, 900 A.2d 797 (2006), the Court addressed whether that portion of the eluding statute that raises the offense from third-degree to second-degree (whether the flight or attempt to elude creates a risk of death or injury to any person) requires an appropriate mental state. In resolving that question in the negative, the *305 Court adopted the reasoning of State v. Dixon, 346 N.J.Super. 126, 135-36, 787 A.2d 211 (App.Div.2001), certif. denied, 172 N.J. 181, 796 A.2d 898 (2002). There, we held that the structure of the eluding statute, N.J.S.A. 2C:29-2b, is such "that the `risk of death or injury' factor, whether considered a sentence enhancer or element of the second-degree crime," does not require a knowing mental state; such mens rea is only applicable to the underlying third-degree crime. Id. at 136, 787 A.2d 211. We noted that in the eluding statute, the "risk of death or injury" language is separated from the rest of the statute by a semi-colon and, unlike the first portion of the statute, the clause after the semi-colon is not preceded by "knowingly." Id. at 135, 787 A.2d 211.
The robbery statute is structured differently. The deadly weapon possession/simulation enhancer elements are found in a separate sub-section headed "Grading," which reads as follows:
Robbery is a crime of the second degree, except that it is a crime of the first degree if in the course of committing the theft the actor attempts to kill anyone, or purposely inflicts or attempts to inflict serious bodily injury, or is armed with, or uses or threatens the immediate use of a deadly weapon.
[N.J.S.A. 2C:15-1b]
As is evident, there are three elements that can elevate the offense to first-degree robbery. The first is "attempts to kill." By definition, an attempt requires purposeful conduct. N.J.S.A. 2C:5-1a. The second element, "inflicts or attempts to inflict serious bodily injury" is preceded by a stated mens rea of "purposely." The third element, and the one of concern here, is the "armed with, or uses or threatens the immediate use of a deadly weapon." It would be an anomaly if only the "armed with" element did not require any mens rea, at least where simulation of a weapon is concerned. A reasonable argument could be made that "armed with" a deadly weapon could be viewed as reflecting "a legislative intent to impose strict liability," N.J.S.A. 2C:2-2c(3), analogous to the risk of harm factor in the eluding statute, discussed in Dixon, supra. One is either armed with a deadly weapon or not. Intent would seldom, if ever, be an issue. The same cannot be said concerning the "threatens the immediate use of" language. Words can be ambiguous; a threat may not be explicit, but may be implied. Here, intent becomes significant. Did the defendant intend that his words convey a threat or were they intended as humorous or only an expression of anger such as the common remark, "I could kill you for that." Examples abound. Justice Albin's observations in State v. Garron, 177 N.J. 147, 173, 827 A.2d 243 (2003), are apt:
[W]e first must say a word on the mystique of language and manners. Men and women express their feelings and desires in many different ways, from the demonstrative and unequivocal to the subtle and suggestive. Communications in the most mundane matters may have many layers of meaning. Interpreting language and conduct concerning our passions and affairs of the heart may be no easier than deciphering hieroglyphics. Some remarks, if taken literally will mean one thing, and if taken in jest another, and if taken half-in-jest, both one thing and another. Unraveling the riddle of the messages we convey through body language and the spoken word requires a high degree of discernment, for often there are surface and underlying meanings.
The need for a mens rea is even more pronounced when the threat is based on simulation. Gestures can be, at least, as ambiguous as words and, at worst, even *306 more so. The present case presents such an example.
As a result, we are satisfied that the simulation element requires a mens rea. While, as we have noted, the same logic would apply to the threatening element, we need not resolve that question in this case. Where a statute does not expressly designate a culpable mental state, but, as we have determined, "necessarily involves such culpable mental state," the gap-filler provision of the Code imputes a mental state of knowingly. N.J.S.A. 2C:2-2c(3). Indeed, that same provision provides that in the absence of a clear indication of legislative intent to impose strict liability, a statute should be construed to contain a knowing mens rea. Ibid.
While the use of a mental state of purposely in the two preceding clauses of the enhancer section would suggest that the same mens rea should apply to the threatening/simulation element, the statute itself is silent and, therefore, logic aside, the Code imports only a knowing mental state.
Our conclusion is fortified by the fact that the "armed with" or "threatens the immediate use" of language was modeled on the New York Penal Code § 160.15. The New Jersey Penal Code, Volume II Commentary, Final Report of the New Jersey Criminal Law Revision Commission 214 (1971). And in construing that statute, New York's highest court has required that a defendant "consciously display something that could reasonably be perceived as a firearm with the intent of compelling an owner of property to deliver it up or for the purpose of preventing or overcoming resistance to the taking." People v. Baskerville, 60 N.Y.2d 374, 469 N.Y.S.2d 646, 457 N.E.2d 752, 756 (1983) (citations omitted) (emphasis added). The defendant must "consciously manifest the presence of an object to the victim in such a way that the victim reasonably perceives that the defendant has a [weapon]." People v. Lopez, 73 N.Y.2d 214, 538 N.Y.S.2d 788, 535 N.E.2d 1328, 1332 (1989).
The State places great reliance on State v. Chapland, 187 N.J. 275, 901 A.2d 351 (2006), in which the Court addressed simulated possession of a weapon under the armed robbery statute. However, the issue there was whether it was necessary "that the victim actually see some tangible item that is supposed to be the simulated weapon." Id. at 278, 901 A.2d 351. The Court held it was not necessary for the victim to see a tangible concealed object "but rather that the combination of words and a defendant's gesture or action can establish the reasonable impression that the defendant possesses a deadly weapon." Id. at 290, 901 A.2d 351. The question we address was not before the Court in Chapland.
It is true, as the State asserts, that the Court in Chapland observed that the trial court's charge on simulation, id. at 280-82, 901 A.2d 351, drawn from the Model Charge, id. at 288, 901 A.2d 351, "provided the jury with a fair statement of the law." Id. at 292, 901 A.2d 351. We do not read that comment as constituting an unqualified endorsement of the charge beyond the issue confronting the Court in that case. In particular, we do not agree with the State's suggestion that the Court "could have addressed [the present claim] in Chapland sua sponte and ruled against the State." What the Court might have done is not relevant; what it did do is of significance.
In any event, we note a significant deviation between the Model Charge as presently constituted and as given to the jury in Chapland, with the charge given in State v. Harris, 357 N.J.Super. 532, 816 A.2d 171 (App.Div.2003), quoted in Chapland, supra, 187 N.J. at 287, 901 A.2d 351. *307 It was the Harris decision that led to revision of the Model Charge to include language on simulation. Id. at 288, 901 A.2d 351. In Harris, the charge required the jury to find beyond a reasonable doubt "that the defendant, through his words and gestures, intentionally led [the victim] to reasonably believe that [he] had a real gun. . . ." Harris, supra, 357 N.J.Super. at 545, 816 A.2d 171. (emphasis added.) Inexplicably, the Model Charge omitted the critical word "intentionally," an omission that carried through to the charge delivered in Chapland and to the present case as well. As we have said, the need for an intentional act on the part of the defendant is critical in the case of simulation. Otherwise, the charge is left to focus only on the victim's reasonable belief, without consideration of defendant's intent.[1]
We agree with the State that defendant did not raise this issue below, requiring that we measure it for plain error. R. 2:10-2. Under the circumstances here, where defendant's intent at the time he interacted with Ms. Nelson was his central defense, the omission of a mental state on this critical element could easily have resulted in an unjust result. Indeed, the prosecutor spent part of his summation refuting defendant's suggestion that he was only gesturing to his genitals rather than simulating possession of a weapon. We cannot say this error was harmless. See State v. Pillar, 359 N.J.Super. 249, 278-79, 820 A.2d 1 (App.Div.), certif. denied, 177 N.J. 572, 832 A.2d 322 (2003).
Reversed and remanded for a new trial.
NOTES
[1] We also agree with defendant that the dictionary definition of simulate contained in the Model Charge requires modification: "To simulate means to assume the outward qualities or appearance of, often with the intent to deceive. It is a feigned, pretended act, usually to mislead or deceive" (emphasis added). The emphasized language is, we believe, inappropriate because in the criminal context the act simulated must always  not "usually" or "often"  be intended to deceive. The use of usually or often could lead one to inappropriately conclude that a gesture not intended to deceive a victim into believing that a weapon is possessed might still constitute prohibited simulation.